STATE OF ARKANSAS VS. LITTLE ROCK, MISSISSIPPI RIVER AND TEXAS RAILWAY COMPANY.

1. RAILROAD AID BONDS: *Construction and effect of the statute, and Constitutional provisions, under which they were issued.*

The act providing for loaning the credit of the State to aid in the construction of railroads, was passed by the General Assembly the 21st of July, 1868, and, two days thereafter, each house, in pursuance of a concurrent resolution, adjourned to meet on the third Tuesday in November, 1868; and, pursuant to said resolution of adjournment, did meet on that day, and continued in session until the 10th day of April, 1869, when both houses adjourned *sine die.* Held:

*First*—That, there being no special provision in the act as to when it should take effect, it did not become operative, or take effect as a law, for any purpose, until "ninety days from the expiration of the session at which it was passed" (Art. 5, sec. 22, Const. of 1868); that the session of the General Assembly that passed the act, expired on the 10th day of April, 1869, when both houses adjourned *sine die;* and that the act did not take effect until ninety days from that date.

*Second*—That the election held on the 3d day of November, 1868, under the provisions of said act, to take the sense of the people on the question of loaning the credit of the State, as therein provided, was held before said act, or any provision of it, was in force, and was a nullity.

*Third*—That the " consent of the people, expressed at the ballot-box," required, by sec. 6 of Art. x of the Constitution, to authorize the loan of the credit of the State, as in said act provided, not having been obtained at an election held for that purpose in pursuance of law, the bonds of the State issued in pursuance of said act were issued without authority of law, and in contravention of the provision of the Constitution, and created no liability on the part of the State, and are void in the hands of innocent holders.

State of Arkansas vs. Little Rock, Mississippi River and Texas R'y Co.

2. LEGISLATION: *Must be complete, etc.*
   A legislative enactment must be complete in all its parts. It cannot take effect for one purpose, and not for another.

3. ————: *Journals of the Senate and House of Representatives.*
   Effect of as evidence that an act was not passed in the manner required by the Constitution, discussed, but nothing decided.

4. ESTOPPEL:
   There can arise no estoppel to deny the existence of a law.

5. AMENDMENT:.
   A void enactment cannot be validated by subsequent amendments.

APPEAL from *Pulaski* Circuit Court.

Hon. J. W. MARTIN, Circuit Judge.

*Henderson, Attorney General,* for the State.

*C. W. Huntington,* for appellee.

*B. C. Brown,* for bondholders.

WALKER, J.:

This is an action of *assumpsit,* commenced in Pulaski Circuit Court, and decided at its May term, 1877, upon the following agreed statement of facts:

"The Little Rock, Pine Bluff and New Orleans Railroad Company was duly incorporated under an act of the General Assembly of the State of Arkansas, approved July 23, 1868, entitled 'An act to provide for a general system of railroad incorporation.'"

On the 10th day of March, 1869, the Little Rock, Pine Bluff and New Orleans Railroad Company, by its president, S. W. Mallory, addressed a communication to the Board of Railroad Commissioners for the State of Arkansas, the portions of which, material to this suit, are in the words and figures following, viz.:

State of Arkansas vs. Little Rock, Mississippi River and Texas R'y Co.

APPLICATION FOR AID.

" LITTLE ROCK, PINE BLUFF AND NEW
ORLEANS RAILROAD COMPANY,
LITTLE ROCK, *March 10, 1869.*

" To the Honorable Board of Railroad Commissioners for the
State of Arkansas:

" The undersigned, president of the Little Rock, Pine Bluff
and New Orleans Railroad Company, respectfully represents that
said railroad company desires to receive State bonds to the amount
of $15,000 per mile for every mile of its road, in accordance with
the provisions of the act making the loan of the State credit to
the individual companies.

" This company was incorporated under the act of July 23,
1868, authorizing the formation of railroad companies, for the
purpose of building, maintaining and operating a railroad from
the city of Little Rock to the southern boundary of the State,
by way of Pine Bluff, together with a branch from Pine Bluff to
Eunice, by way of Napoleon, making the aggregate length of
main stem and branches about 260 miles.

" The following is the organization of the company:

" Directors—G. R. Weeks, O. P. Snyder, S. W. Mallory, J.
M. Lewis, J. E. Sickels.

"Officers—S. W. Mallory, president ; George R. Weeks, treas-
urer; O. P. Snyder, secretary.

"The capital stock of the company is fixed at $27,000 for every
mile of its road. Such preliminary examinations of the routes
have been made as were necessary to enable the company to as-
certain their approximate cost, and for their general direction.
The accompanying map shows the country traversed by the pro-
posed routes, and their terminal points. The subscription to the
capital stock of the company amounts to the sum of $265,000.

Had it been deemed important to the immediate interests of the company, or at all likely to influence the action of your board, this subscription might have been largely increased, but, guided by the judgment of the warmest friends of the enterprise, the company determined to await the perfect restoration of public tranquility before making further effort in this direction. Enough, however, has been ascertained of local popular feeling regarding the enterprise, to place its success, if aided by the State, beyond all reasonable contingencies. The undersigned is now able to state that large individual, county and municipal subscriptions to the capital stock of the company are specifically promised, as well as liberal donations of lands contiguous to the routes. These, together with the proceeds of the first mortgage bonds of the company, to the amount of $10,000 per mile, which it is proposed to issue (the Board of Directors, by resolution, having authorized the issue of said bonds), will make an aggregate of resources which will reach the sum of $3,000,000. * * *

[L.S.]                                              "S. W. MALLORY,

"President Little Rock, Pine Bluff and New Orleans Railroad Company."

Subsequently, to-wit, on the 15th day of March, 1869, the said Board of Railroad Commissioners made an award of State aid in words and figures following, viz.:

" NOTIFICATION OF AWARD OF AID,
OFFICE BOARD RAILROAD COMMISSIONERS, ARK.,
LITTLE ROCK, *March 15, 1869.*

" S. W. Mallory, president of the Little Rock, Pine Bluff and New Orleans Railroad Company.

" SIR: Having considered the application of the Little Rock, Pine Bluff and New Orleans Railroad Company, made through you, its president, for a loan of the State credit, in pursuance of an act entitled 'An act to aid in the construction of railroads,'

State of Arkansas vs. Little Rock, Mississippi River and Texas R'y Co.

approved July 21, 1868, and ratified, after being submitted, by the people, at a general election held November 3, 1868 (in accordance with section 6, Art. x, of the Constitution of the State), and, being satisfied that the construction of said line of railroad will be a public benefit, the application of said company for a loan of the State credit, to the amount of $15,000 per mile, for a distance of one hundred and twelve miles, is hereby approved, and said loan of the State credit is pledged and granted to said railroad company, and said railroad company shall be entitled to, and have a right to ask for, demand and receive the bonds of the State, hereinbefore declared to be pledged and granted, after complying with and fulfilling the terms and conditions of the above-named act.

"POWELL CLAYTON,
"ROB'T J. T. WHITE,
"BENJ. THOMAS,
·"Board of Railroad Commissioners."

The following is an extract from the proceedings of said Board of Railroad Commissioners, upon application of said company, to-wit:

"EXECUTIVE OFFICE,
"LITTLE ROCK, March 15, 1869.

"Board of Railroad Commissioners met at the call of the president—all the members present.

"Commissioner Benjamin Thomas moved to take up the application of the Little Rock, Pine Bluff and New Orleans Railroad Company for State aid, which motion was adopted, and, after due consideration, the board consented to approve and grant said application for State aid, and for that portion of the road which lies between Pine Bluff and the State line, commencing at Pine Bluff and running southeasterly with the line of the road toward the State line, one hundred and twelve miles.

*Vol. XXXI.—45.*

State of Arkansas vs. Little Rock, Mississippi River and Texas R'y Co.

" On motion of R. J. T. White, the board adjourned, to meet at the call of the president.

"POWELL CLAYTON, President.

"BENJ. THOMAS, Secretary."

Subsequently, to-wit: On the 25th day of June, 1870, upon the application of said company, said Board of Railroad Commissioners granted additional State aid to said company, to the extent of eight miles of the road, at the rate of $15,000 per mile; and, again, on the 16th day of March, 1871, upon a similar application, said Board of Railroad Commissioners granted additional State aid to said company, to the extent of fifty additional miles of said road, at the rate of $15,000 per mile.

The amount of bonds issued by the State of Arkansas to the Little Rock, Pine Bluff and New Orleans Railroad Company, under the aforesaid act of July 21, 1868, with the dates and amounts of each respective issue, is as follows, to-wit:

| | |
|---|---|
| April 26, 1870 | $150,000 |
| August 25, 1870 | 150,000 |
| October 17, 1870 | 300,000 |
| January 17, 1871 | 150,000 |
| September 25, 1871 | 450,000 |
| Total issue | $1,200,000 |

The State of Arkansas has paid from time to time, between the 1st day of April, 1871, and the 1st day of October, 1872, to the holders of the bonds issued in aid of the Little Rock, Pine Bluff and New Orleans Railroad Company, the sum of $108,570, as interest upon said bonds, to recover which said sum of money so paid, with interest thereon, this action is brought against the present defendant corporation.

On the 25th day of April, 1870, the Little Rock, Pine Bluff and New Orleans Railroad Company, duly executed and delivered to one Benjamin A. Farnham and David B. Sickles, as trustees, and caused to be recorded, June 25, 1870, a certain mortgage, or deed of trust, upon the railroad, franchises and property of said company, to secure the payment of certain bonds which said company proposed to issue and negotiate, amounting in the aggregate to the sum of $1,200,000. A copy of said mortgage, or deed of trust, is herewith filed, marked "Exhibit A," and is made a part of this agreed statement of facts.

The Little Rock, Pine Bluff and New Orleans Railroad Company subsequently issued all the bonds authorized to be issued under the aforesaid mortgage, or deed of trust, but failing to pay the interest upon said bonds, as the same became due and payable, and otherwise to comply with the terms and conditions of said mortgage, a suit was instituted in the Circuit Court of the United States for the Eastern District of Arkansas, on the—— day of March, 1875, for the foreclosure of said mortgage, or deed of trust, and a sale of the property and franchises therein described, and such proceedings were had in said suit that on the ——day of December, 1875, all the railroad, properties and franchises, in said mortgage deed described, were duly and legally sold under and by virtue of a decree of said Circuit Court of the United States, which said sale was duly confirmed by the order and decree of said court, on said——day of December 1875. The purchasers at said sale became and organized a corporation by the name of the Little Rock, Mississippi River and Texas Railway, under and by virtue of an act of the General Assembly of the State of Arkansas, approved December 9, 1874, and entitled "An act supplementary to an act entitled 'An act to provide for a general system of railroad incorporation,' approved

July 23, 1868." Said last named corporation is the defendant in the present action.

At the general election of the State of Arkansas, held on the 3d day of November, 1868, for the election of State and County officers, a majority of the electors voting at that election voted "for railroads," as appears by the returns of said election, on file in the office of the Secretary of State of the State of Arkansas.

The Constitution of the State of Arkansas, adopted in the year 1868, as well as the statute laws of said State, and the Journals of the General Assembly for the year 1868, may be referred to by either party to this suit.

If, upon the foregoing statement of facts, the court shall be of the opinion that the defendant corporation is liable in any form of action or proceeding, or by any process, for the sums of money, so as aforesaid paid by the State for interest, judgment is to be rendered in favor of the State, for the sums so paid with interest thereon from the respective dates of payment, at the rate of six per centum per annum, which judgment may be paid or satisfied in the manner provided in section 7, of the aforesaid act of July 21, 1868, for the payment of the annual tax therein specified.

Upon this agreed statement of facts, and after argument of counsel, the Circuit Court found that the law arising on said agreed statement of facts is in favor of the defendant; that the act of July 21, 1868, to authorize State aid to be granted in the construction of railroads was never, in fact, constitutionally passed; that the money paid by the State in the redemption of coupons attached to said State aid bonds so issued and delivered to the Little Rock, Pine Bluff and New Orleans Railroad, did not become a specific lien on the franchises of the existing company, as against the rights of those claiming under the mortgage deed of April 25, 1870; nor a valid claim against the

State of Arkansas vs. Little Rock, Mississippi River and Texas R'y Co.

defendant company, which purchased under said mortgage; and rendered judgment thereon in favor of the defendant.

Plaintiff moved for a new trial, and assigned the following as causes for granting the same:

*First*—The court erred in finding for the defendant on the agreed statement of facts.

*Second*—The court erred in declaring the act of July 21, 1868, "To aid in the construction of railroads," void.

*Third*—The court erred in failing to give judgment for plaintiff, even admitting the act aforesaid to have been void.

*Fourth*—The court erred in refusing to find for the State, on the agreed statement of facts, as defendant corporation succeeded to all the rights, but took the legal liabilities, chargeable upon the Little Rock, Pine Bluff and New Orleans Railroad, which is the present company's line of road.

The Circuit Court overruled the motion for a new trial. Plaintiff excepted, and has brought the case before this court on appeal.

The case has been argued with much ability on behalf of the State, of the railway company, and by counsel who have been permitted to appear on behalf of the bondholders.

The plaintiff contends that the bonds of the State, issued to aid in the construction of the Little Rock, Pine Bluff and New Orleans Railroad, under provisions of an act, approved July 21, 1868, to which coupons for interest were attached, $108,570 of which she has paid, were a charge upon the road, and that the Little Rock, Mississippi River and Texas Railway Company, which succeeded by purchase to the franchises and property of the Little Rock, Pine Bluff and New Orleans Railroad Company, is liable to the State for the coupons so taken up by her.

The Little Rock, Mississippi River and Texas Railway Company deny their liability to pay these coupons upon the grounds:

*First*—That the bonds were issued without authority of law, and are null and void.

*Second*—That if valid, the bonds were not a lien upon the road and its property, to secure the payment of the bonds or the coupons attached, but that the only right which the State has is to sequestrate the income and revenues of the company.

The main question to be determined is as to the validity of the bonds to which the coupons (the payment of which is the object of this action) were attached; because, if. the bonds are void, the coupons for the payment of interest are also void. Our first inquiry, therefore, will be directed to the questions: Are the bonds valid? Had the State of Arkansas power, through her Executive department, to issue them?

It may be as well at once to dissipate the assumption, too frequently but thoughtlessly indulged, that the power of a State, through its Legislative department, is omnipotent. Such is not the case. There is, so to speak, a power behind the throne—a sovereignty higher than State sovereignty. To the people in their sovereignty belong the rights of eminent domain and of taxation. They may delegate these rights to a sovereign State, or they may retain them to be exercised through the law-making power, upon terms prescribed by the State Constitution.

There is no subject which has been held more sacred by the people than that of taxation; none that has been guarded with more vigilance, nor for the preservation of which greater sacrifices and perils have been incurred. Influenced by this feeling, the people of Arkansas, when they framed their Constitution of 1868, ordained, section 6, Art. x, "The credit of the State or counties shall never be loaned for any purpose without the consent of the people expressed through the ballot-box."

The ground of objection to the validity of the bonds is, that the State attempted, by legislative enactment, to loan its credit

to Little Rock, Pine Bluff and New Orleans Railroad Company, without first having obtained the consent of the people of the State by a majority vote at the ballot-box. Whether such consent had, or had not, been given before the act of July 21st, 1868, under which the bonds to aid in the construction of the road were issued, and whether the act was, or not, in force at the time, it is alleged, a vote was taken on the 3d of November, 1868, at which such consent was given by a majority vote, present the most important questions for our consideration.

The 12th section of the act of July 21st, 1868, provides that "at the next general election, to be holden under the provision of sec. 3, Art. xv, of the Constitution of this State, the proper officers having charge of such election shall open a poll as in other cases, take and receive the ballots of the electors qualified to vote for officers at such election, for and against this act, and in compliance with sec. 6, Art. x, of the Constitution ; such ballots to contain the words ' For Railroads,' or, 'Against Railroads;' and if it appears that a majority so voting have voted for railroads, this act shall immediately become operative and have full force, and all laws heretofore passed for loaning the credit of this State in aid of railroads shall cease and be void ; but if a majority shall be found to have voted against railroads, this act shall be void and of no effect."

It appears, from the journals of the legislature, which are made part of the evidence in this case, that the legislature took a recess, or adjourned, from the 23d of July, till the 17th of November of that year, and continued in session until the 10th of April, 1869, at which time it finally adjourned, the whole time, from the commencement of the session to its adjournment, being, in fact, but one session.

No provision was made by the act of July 21st, 1868, declaring the time when it should take effect, and where such is the

case, by Art. v, sec. 22 of the Constitution, it is ordained that " No public act shall take effect, or be in force, until ninety days from the expiration of the session at which the same was passed;" and, consequently, the act did not take effect, and was not in force, until ninety days after the 10th of April, 1869 ; so that, in fact, on the 3d of November, 1868, ten months before the act took effect, when, it is claimed, that an election was held and a majority vote taken in favor of railroads, the act authorizing the same was not in force ; and if not, then the election was held without authority of law, and was void.

In so holding, we are sustained by several decisions to which we will refer :

In the case of *Wheeler* v. *Chubbuch*, 16 Ill., 361, the question presented for the consideration of the court was, as to the time when an act of the legislature of Illinois took effect. The act was to prevent sheep and swine from running at large in Henry, Will, Livingston and Lake Counties, approved January 29, 1853. The act provided, " that from and after the 1st day of March next, it shall not be lawful for any person, or persons, possessor, or possessors of any sheep and swine, to allow them to run at large within said counties."

Catron, judge, when considering the time when the act took effect, said : " The question is, as to whether the law took effect and became in force before the expiration of the sixty days from and after the close of the session at which it was passed. We think it did not. The 23d section, Art. 3. Constitution, declares : " And no public act of the General Assembly shall take effect, or be in force, until the expiration of sixty days from the end of the session, at which the same may be passed : unless, in case of emergency, the legislature shall otherwise direct. * * * * But such direction must be made in clear, distinct, and unequivocal provisions ; and cannot be helped out by any sort of intend-

ment, or implication. * * * * In order to take an act out of the Constitutional provision, the legislature must direct that the act, as a whole and entirety, shall take effect at a different time; and it is not sufficient that certain parts of it might have a construction which would, taken separately, give those parts effect at an earlier period."

In the case of *The Board of Supervisors of Iroquois County* v. *Keady et al.*, reported in 34 Ill., 293, the question as to when an act of the legislature took effect, again came before the same court, in which Mr. Justice Beckwith, who delivered the opinion of the court, said: The 5th section of Art. 7 of the Constitution, provides that no county seat shall be removed until the point to which it is proposed to be removed shall be fixed by law, and a majority of the voters of the county shall have voted in favor of a removal to such point. This provision contemplates the passage of a law authorizing an election to be held, and prescribes the time and place where it shall take place, the manner in which it shall be conducted, and the results made known, without which the proceedings would be those of an unauthorized assembly. Before the passage of the act of February, 1863, there was no law authorizing such an election to be held by the voters of Iroquois County. An election was held on the 16th of April, 1863, and if the act mentioned had not then become a law, it is evident that no such vote has been given in favor of the removal of the county site as the Constitution provides. Sec. 3, Art. 3, declares that no public act of the General Assembly shall take effect, or be in force, until the expiration of sixty days from the end of the session at which the same is passed, unless so expressly declared by the legislature. The session of the General Assembly which passed the act, had not terminated when the election was held, and the act could not have become a law until after the expiration of sixty days from the end of the session, without the express declaration of the legislature to that effect.

In the case of *The City of St. Louis* v. *Alexander et al.*, 23 Mo., 483, where a vote was taken and subscription made to the stock of a railroad company, by the county of St. Louis, during the time which intervened between the passage of the act, and the time when it went into effect, it was insisted that the subscription was legal; but the court said (a full bench not being present) : " It was, in our opinion, illegal for the County Court to subscribe for stock under this act without taking the previous necessary step, to present the question to the voters of the county ; and the act must be in force before such step could lawfully be taken."

In the cases above cited, all the material questions presented in the case now under consideration were brought in review. They all hold, that a vote of the people, expressive of their assent to be taxed, must be taken under authority of law, before the legislature can enact a valid law to bind the people of the State to pay debts contracted under it.

Our Constitution expressly denies that the credit of the State shall ever be loaned for any purpose, without the consent of the people thereto expressed at the ballot box. The right to legislate upon the subject is dependent upon this consent, as a condition precedent to its exercise. The Constitution, in this respect, as in most others, is a limitation upon legislative power. Without providing any mode of ascertaining the popular will, it cannot execute itself, nor can the people, in their sovereign capacity, assemble and make a declaration of assent, because, under all the several departments to which the powers of government are distributed, the means of giving effect to them are required to be under the sanction of law. So distinctly held in the case above cited.

Mr. Justice Wagner, in the case of *St. Joe Railroad* v. *Buchanan County Court*, remarked that: " The Constitution, except when special provision is made for that purpose, does not

enforce itself. It defines certain powers; but to make them operative, legislation is necessary."

The authorities upon this point are numerous and clear, and we do not understand counsel as contending that, in order to give effect to this constitutional provision, legislation is not necessary; nor that it is not also necessary, before the passage of an act which provides for loaning the credit of the State for railroad purposes, that the qualified voters of a State, should assent to the passage of a law by a majority vote. But they contend that if a majority so voting, vote for railroad, the law becomes operative and is in force. But if this be true, and the law is to take effect as soon as the vote is counted and the fact ascertained, it was certainly not in force before that time; nor when the polls were opened, the votes taken, and the count made, because all these acts must precede the ascertainment of the result, which calls the act into existence; and as a consequence, at the time when the election was held and the vote taken, there was no law in force; no legal obligation upon any one to make a correct and fair return of the result, which is sometimes found to be so important in the due administration of the law. So that this construction is unavailing, or, if well taken, we are unable to conceive how a legislative enactment, which of necessity must be complete, can be made to take effect for one purpose and not for another.

The whole act must be perfect in all its parts, before it leaves the legislative department. And unless by an express declaration in the act itself as to the time when it is to take effect, under the express provisions of the Constitution, it does not go into effect, and is inoperative as a law, until ninety days after the adjournment of the session at which the law was passed.

The remarks of Mr. Williams, special judge, in the case of *Whitehead* v. *Wells,* that a law did not take effect until ninety

days after its passage, was inadvertently made and escaped the attention of the court when the opinion was delivered, and must be considered as qualified to conform to this opinion.

Mr. Cooly, Const. Lim., page 117, remarks that it is not always essential that, to be a complete statute, it must take effect as a law at the time it leaves the hands of the legislative department; but its taking effect may depend upon a subsequent event.

It is true that the time when the statute is to take effect, may be made to depend upon subsequent events; but the necessary events in this case, to give force to the statute, must necessarily be precedent to the time of holding the election, not subsequent to it. At the time, therefore, that the law took effect, no vote had been taken at the ballot box, and, consequently, no power to legislate upon the subject of loaning the credit of the State.

In addition to this ground of objection to the validity of the act granting State aid, it is urged as an additional ground that the act of 21st July, 1868, was not read three times on three several days, in the two houses of the Legislature, as required by the provisions of the Constitution, and that for this reason, also, the bonds are void.

Art. V, section 21, Constitution, declares that every bill and joint resolution shall be read three times, on different days, in each house, before the final passage thereof, unless two-thirds of the house, where the same is pending, shall dispense with the rules.

It appears from House Journal, 1868, p. 480, July 20, on motion of Mr. Benjamin, substitute for Senate bill No. 49, an "Act to aid in the construction of railroads," was read first time.

Same day, on motion of Mr. Johnson, the rules were suspended and the bill read second time.

On the same day, after several amendments, on motion of Mr. Johnson, the bill was read the third time and put upon its final passage, and passed ; pp. 481–2.

No suspension of the rules for the third reading appears.

On the same day the bill was reported to the senate, " house amendment was concurred in," the bill read a third time and passed. Senate Journal, p. 246. No suspension of the rules shown.

Thus it appears that the substitute bill was not read on three several days, in either house, nor does it appear that the rules were suspended by a two-thirds vote. The act was, therefore, passed, it would seem, in violation of the Constitution.

In the cases of *The Town of South Ottawa* v. *Perkins*, and *The Board of Supervisors of Kendall County* v. *Post*, decided by the Supreme Court of the United States, reported in the Central Law Journal, vol. 4, p. 442, the question of the validity of an act of the Legislature of the State of Illinois was considered at great length, and Mr. Justice Bradley, who delivered the opinion of the majority of the court, said : "As early as 1853, it was decided in *Spangler* v. *Jacoby*, 14 Ill., 299, that it was competent to show from the journals of either branch of the Legislature that a particular act was not passed in the mode prescribed by the Constitution, and thus defeat its operation altogether. The Constitution requires each house to keep a journal, and declares that certain facts, made essential to the passage of a law, shall be stated therein. If those facts are not set forth, the conclusion is that they did not transpire. The journal is made up under the immediate direction of the house, and is presumed to contain a full and complete history of its proceedings. If a certain act received the constitutional assent of the body, it will so appear on the face of the journal. And when a contest arises as to whether the act passed, the journal may be appealed to, to

settle it. It is the evidence of the action of the house, and by it the act must stand or fall."

The bill was enrolled, signed by the speaker of the house and president of the senate, and approved by the governor. It was passed in 1857, had been on the statute book thirteen years, and under it, the inhabitants of South Ottawa voted to subscribe stock to the railroad company, and authorized the issuance of bonds to pay its subscription. The journals did not show that the act had passed.

It was held that the journals might be used as evidence to prove this fact, and the bonds were held to be void, even in the hands of innocent purchasers.

In the case before us, it affirmatively appears that the bill passed three readings, in the house, in one day, and on the same day. was passed in the senate, and on the next day received the approval of the governor.

This is a strong case, and leaves no margin for presumption in favor of the regularity of the proceedings. It is much stronger than that of *English* v. *Oliver*, reported in 28 Ark. Rep., p. 320, in which it was held that presumption of the regularity of the proceedings might be indulged where nothing to the contrary appeared. Whilst in this case, no presumption in favor of the regularity of the proceedings can be indulged, as the question is one of no ordinary importance, and as we may well rely upon the other ground of objection, with regard to which the authorities are clear, we will decline to express any positive opinion with regard to the invalidity of the act of the legislature, because not read the number of times, on different days, as required by the Constitution.

It is next argued by counsel for plaintiff, that the railroad company, having received the bonds and disposed of them, is estopped from denying their validity.

The numerous authorities cited by counsel in support of this position, would sustain them under ordinary issues between parties contracting, but not where the contract is void for want of power to contract. The party is never estopped from denying the existence of a law, but the effect of estoppel is to deny the existence of that, which, if undenied, has force and effect. That which is void in law is, in law, nothing, whether denied or admitted. If there is no contract, there can be no estoppel.

In the case of *The Town of South Ottawa* v. *Perkins*, above cited, Mr. Justice Bradley, when considering this question, said: " There can be no estoppel in the way of ascertaining the existence of a law. That which purports to be a law of a State is a law, or it is not a law, according as the truth of the fact may be, and not according to the shifting circumstances of parties. It would be an intolerable state of things if a document, purporting to be an act of the legislature, could thus be a law in one case and for one party, and not a law in another case and for another party ; a law to-day and not a law to-morrow ; a law in one place, and not a law in another in the same State. And whether it be a law or not a law, is a judicial question to be settled and determined by the courts and judges. The doctrine of estoppel is totally inadmissible in the case."

Nor can the fact that, under a misapprehension of the character and invalidity of the act of July 21st, 1868, the State subsequently passed a law in amendment of it, affect the question. This question came before the Supreme Court of the United States, and was disposed of in the opinion above referred to. Mr. Justice Bradley says: Thus far, we have not adverted to the argument attempted to be drawn by the defendants from the fact that the act in question was referred to in two subsequent acts of the legislature. The legislature, in 1869, could not give validity to a void act passed in 1857. The most that can be said is, that

in referring to the act of 1857, the legislature inadvertently supposed that it had been passed. Not only courts, but individuals, are bound to know the law, and cannot be heard to plead ignorance of it. The holder of the bonds can claim no indulgence on this score, and can take no advantage from the allegation, that he is a *bona fide* purchaser, without notice. He will be precluded from doing so on another ground, the want of legislative authority, in fact, in the town to issue the bonds in question.

Judge Dillon, in his work on corporations, paragraph 419, says: "Where the authority to act is solely conferred by statute, which is, in effect, the letter of attorney of the officer, all persons must, at their peril, see that the act of the agent on which he relies, is within the power under which the agent acts; and this salutary and sound doctrine seems to be recognized by the Supreme Court of the United States in its most recent judgments. Accordingly, the bonds issued in violation of an express statute, or Constitution, are void, though in the hands of innocent holders for value." And the same author, paragraph 426, says: "It may be remarked, in conclusion, that this general survey of the adjudications shows some difference of opinion (chiefly in cases involving the rights of innocent holders of negotiable municipal securities), respecting the evidence of the compliance with conditions, and as to what will estop the municipality from showing a non-compliance in fact with such conditions. Yet, aside from these differences, the courts all agree that such a corporation may successfully defend against the bonds, in whosesoever hands they may be, if its officers or agents, who assumed to issue them, had no power to do so. The officers of such corporations possess no general power to bind them, and have no power except such as the legislature confers. If the statute authorizes such a corporation to issue its bonds only when the measure is sanctioned by a majority of the voters, bonds

State of Arkansas vs. Little Rock, Mississippi River and Texas R'y Co.

issued without such sanction (either in fact or according to the decision of some authorized body or tribunal), or when voted to one corporation, and issued to another, are void, into whosesoever hands they may come. This is a sound and true rule of law on this subject, and the one which has had the almost uniform approval of the State courts in this country, and has recently received the high sanction of the Supreme Court of the United States." The author, keeping in mind all the while, the distinction between the want of power to issue the bonds, and irregularities in the exercise of the power.

Mr. Justice Field, in *Marsh* v. *Fulton County*, 10 Wallace, 676, most clearly and forcibly draws the distinction between the want of special power to contract, and the general power to contract. He says: " But it is earnestly contended that the plaintiff was an innocent purchaser of the bonds, without notice of their invalidity. If such were the fact, we do not perceive how it could affect the liability of the county of Fulton. This is not a case where the party executing the instrument possessed a general capacity to contract, and where the instruments might, for such reason, be taken without special inquiry into their validity. It is a case where the power to contract never existed—where the instruments might, with equal authority, have been issued by any other citizen of the county. It is a case, too, where the holder was bound to look to the action of the officers of the county, and ascertain whether the law had been so far followed by them as to justify the issue of the bonds. The authority to contract, must exist before any protection as an innocent purchaser can be claimed by the holder."

The bonds were held void in the hands of a *bona fide* purchaser for want of authority in the county to issue them. And so in this case, we must hold that the bonds of the State of Arkansas, issued by the Governor of the State, her agent, are void

*Vol. xxxi.—46.*

even in the hands of innocent purchasers, because the authority to contract did not exist at the time the bonds were issued. It is the lack of power to sell, and not the abuse of power in making the sale, which renders the sale void. And upon this distinction as to contracts entered into by the State authorities without power to contract, and that other class of cases, where the power to contract existed, but may have been abused, we rest our decision.

In the first class of cases, it is no repudiation of a contract to deny its payment, because, not being a contract, there can be no repudiation of it. But in the second class, where the power does exist but has been abused, if the bonds passed into innocent hands for a valuable consideration, an obligation may rest upon the State to pay them, and it would be repudiation to refuse payment. States, as well as all other parties who act through agents, lawfully appointed and acting within the pale of their authority, are bound by the acts -of such agents, even though they may be prejudicial to the interest of the party conferring the power to contract.

The question of lien upon the road and its effects need not be considered.

We must hold the bonds utterly void. The State is not responsible for them, and, as a consequence, has no debt to be secured by lien, nor has the State any claim upon the road for the coupons paid by her. The road is not responsible for them, and is under no obligation to redeem the coupons of void bonds. To pay them was an act of folly on the part of the State.

Finding no error in the judgment and decision of the Circuit Court, the same is, in all things, affirmed, with costs.