JAMES ANDREWS, Defendant in Error, *v.* ST. LOUIS TUNNEL RAILROAD COMPANY ET AL., Plaintiffs in Error.

**December 9, 1884.**

1. MECHANIC'S LIENS — RAILROADS. — Labor and materials provided for in the contract and necessary for the work, may be covered by a mechanic's lien, though they are not actually incorporated in the structure.

2. CONSTITUTIONAL LAW. — The railroad lien act of March 21, 1873, did not go into effect until ninety days after its passage.

3. —— PRIORITY OF LIENS — FORECLOSURE OF DEED OF TRUST. — The lien of a deed of trust executed prior to the passage of the act of March 21, 1873, is superior to that of a lien for materials furnished for the road after the passage of the act but prior to the expiration of the ninety days, though a portion of the purchase price of the secured bonds was not paid until after the making of the contract for the materials for which a lien is asked.

4. —— EQUITY. — The foreclosure of the deed of trust under such circumstances leaves nothing for a court of equity to adjust as between the respective lien claimants, and vests a complete title in the purchaser at the foreclosure sale.

APPEAL from the St. Louis Circuit Court,

*Reversed and jugdment.*

WELLS H. BLODGETT, for the plaintiffs in error: The act of March 21, 1873, took effect ninety days after its passage, because no other time was therein appointed. — Wag. Stats. 1872, p. 894, sect. 4. It is not sufficient that certain parts of the act might bear a construction which would, taken separately, give those parts effect at an earlier period. The legislature must direct when the act as a whole shall take effect. — *Wheeler* v. *Chubbuck*, 16 Ill. 261; *Board of*

*Supervisors, etc.*, v. *Keady*, 34 Ill. 293 ; *The State* v. *Little
Rock, etc., R. R. Co.*, 31 Ark. 701. The words " prior
to the passage of this act," had before their introduction
into this law been judicially construed to have reference to
the time of the taking effect of the law, and not to the date
of passage. — *Charles & Blow* v. *Lamberson*, 1 Iowa, 435 ;
*Rogers* v. *Vass*, 6 Iowa, 405 ; *Graham* v. *Springfield*, 21
Me. 58 ; *Jackman* v. *Garland*, 64 Me. 133. If the act did
not go into effect until ninety days after its passage, or
until June 19, 1873, then the plaintiff can have no lien,
because he began work under his contract on April 21, and
what he did before the act took effect can not be separated
from what he did afterwards. — *Donahy* v. *Clark*, 12 Cush.
440; *Edgar* v. *Salisbury*, 17 Mo. 270 ; *National Bank of
Salem* v. *Redmon*, 57 Me. 405 ; *Baker* v. *Fessenden*, 71
Me. 292. The bonds secured were negotiable by the law
merchant without the words " value received."— *Gargier*
v. *Mieville*, 3 B. & C. 45 ; *Hatch* v. *Frayes*, 11 A. &
E. 702 ; *McLeod* v. *Snee*, 2 Ld. Ray. 1481 ; *Mercer
County* v. *Hackett*, 1 Wall. 83 ; *Cota* v. *Burk*, 7 Metc.
(Mass.) 588 ; *Stevens* v. *Blunt*, 7 Mass. 240. If the bonds
were negotiable, then they were good in the hands of any
innocent holder for value. — *Murray* v. *Lardner*, 2 Wall.
110 ; *Consolidated Association* v. *Numa Avegno*, 28 La.
An. 552 ; *City of Elizabeth* v. *Force*, 20 N. J. Eq. 587 ;
*Spooner* v. *Holmes*, 102 Mass. 503. When delivered the
bonds took effect from their date by relation. — *Snaith* v.
*Mingay*, 1 M. & S. (K. B.) 87 ; *Powell* v. *Waters*, 8
Cow. 670 ; *Huston* v. *Young*, 33 Me. 85. If the bonds
were negotiable, then by whatever title parties took the
bonds, by that title they took the security. — *Logan* v.
*Smith*, 62 Mo. 455 ; *Goodfellow* v. *Stillwell*, 3 Mo. 17.
Purchasers were not bound to inquire whether the bonds
were issued simultaneously with the execution of the
mortgage by which they are secured. — Jones on Railroad
Securities, sect. 210.

JOHN C. BROWN, of counsel for the plaintiffs in error.

ROMBAUER & GOLDSMITH and A. G. COCHRAN, for the defendant in error: What construction shall be placed upon these words, "subsequent to the passage of this act." There can be no doubt that an act is passed when it receives a majority of the votes of both houses and is approved by the governor. — *Logan v. The State*, 3 Heisk. 442; *Wantmann v. City of Phila.*, 33 Pa. St. 202; *The People v. Clark*, 1 Cal. 406; *Brainard v. Bushnell*, 11 Conn. 17; *In re Richardson*, 2 Story, 580; *Baker v. Compton*, 52 Texas, 258. If the act of March 21st did not take effect until ninety days after the date of its passage, the defendant in error would still clearly be entitled to his lien. — *Walker v. Railway Co.*, 2 Cent. L. J. 481; *Hauptmann v. Catlin*, 20 N. Y. 250. "The act applies, where a contract for a building was made before its passage, to a claim for labor or materials supplied after its passage in performance of the contract." — *Sullivan v. Brewster*, 1 E. D. Smith, 681; *Miller v. Moore*, 1 E. D. Smith, 739. "The doctrine as to mechanics' liens now is that the statute is highly remedial in its nature, and should receive a liberal construction to advance the just and beneficent objects had in view in its passage." — *De Witt v. Smith*, 63 Mo. 263; *Putnam v. Ross*, 46 Mo. 337; *Aster v. Rabenau*, 46 Mo. 599; *Dewitt v. Smith*, 63 Mo. 263; *Morgan v. Railroad Co.*, 76 Mo. 172. "All the plaintiff is required to show is the fact that the materials were furnished for the purpose of being used in constructing the building." — *Morrison v. Hancock*, 40 Mo. 561. Even if there were some objectionable items in the account they are easily separable from other items to which there can be no objection, and for those latter respondent would have a lien. — *Edgar v. Salisbury*, 17 Mo. 273; *Allen v. Mining and Smelting Co.*, 73 Mo. 688. It is a well settled doctrine in regard to mortgages securing future advances that "where the mortgagee is not bound to make the advances, and has actual notice of a later

encumbrance upon the property for an existing debt or liability, such later encumbrance will take precedence of the mortgage, as to all advances made after such notice." — *Frye* v. *Bank of Ill.*, 11 Ill. 367; *Spader* v. *Lawler*, 17 Ohio, 371; *Hughes* v. *Worley*, 1 Bibb, 200; *Bell* v. *Fleming*, 11 N. J. Eq. 13, 490; *Boswell* v. *Goodwin*, 31 Conn. 74; *Bank of Montgomery Co.'s Appeal*, 36 Pa. St. 170; *Ter Hoven* v. *Kerns*, 2 Barr, 96; *Parker* v. *Jacoby*, 3 Grant (Pa.) 300. "The proper object of a bill in equity to foreclose a mortgage is to cut off all rights subsequent to the mortgage. The rights of any one so interested, not made a party to the bill, are not affected by the decree of foreclosure and the sale under it, but he may redeem as before the sale." — *Rogers* v. *Holyoke*, 14 Minn. 220; *Gould* v. *Wheeler*, 28 F. N. Eq. 541; *Stewart* v. *Johnston*, 30 Ohio St. 24; *Murdock* v. *Ford*, 17 Ind. 52; *Farwell* v. *Murphy*, 2 Wis. 533; *Shaw* v. *Heesey*, 48 Iowa, 468; *Carpentier* v. *Brenham*, 40 Cal. 221.

LEWIS, P. J., delivered the opinion of the court.

The plaintiff, under a contract with the defendant Tunnel Railroad Company, dated April 21, 1873, constructed its tunnel and railway from Third Street to the south line of Market Street, in the city of St. Louis. His account for labor and materials furnished amounted to $661,576.65, of which sum the tunnel company paid him $583,147.42, leaving unpaid a balance of $78,429.23. For this balance he asks judgment, with a lien on the tunnel and railway property, under an act of the general assembly, approved March 21, 1873, and transcribed into the Revised Statutes at sections 3200 and the sixteen there next following. There is no dispute about the plaintiff's right to a general judgment for the amount claimed, with interest; but the defendants, the Tunnel Railroad Company, and Barton Bates and Charles Tracy, trustees as hereinafter shown, resist the imposition of the lien.

One objection raised against the lien rests on the ground that some items in the account filed are not proper subjects of a lien under the law. These items may not appear to have been for either labor or materials incorporated in the actual construction of the tunnel, the road-bed or the railway. But, for aught that this record shows, every one was for labor or material as essential to the construction, or to some duty to the public arising from its practical necessities, and specially stipulated for in the contract as were the rails, the ties, or any material or labor used in the work. No lien could be claimed for them, if they were severable from the construction to be duly performed under the contract, or if they were set up as independent demands resting upon their own merits, without reference to the contract or the work contracted for. The items here objected to are chiefly for taking down houses on the line of the tunnel, for temporary bridges, sewers, water and gas pipes, etc., necessary to the public convenience while the work was progressing, or after its completion, and specifically provided for in the contract. The weight of authority in similar cases is decidedly in favor of the lien. *Hazard P. Co.* v. *Byrns*, 21 How. Pr. 189 ; *Winslow* v. *Urquhart*, 39 Wis. 268 ; *Vandegrift and Forman's Appeal*, 83 Pa. St. 127 ; *Willamette Co.* v. *Renick*, 1 Ore. 169. We remark upon this point, not because it may influence our determination of the cause before us, but chiefly for the purpose of explaining or modifying, if need be, what was said by this court in *Knapp* v. *Railway Co.* (6 Mo. App. 205). The principal point decided in that case was, that a lien for work done upon a railroad must cover the whole road, and not a part of it alone. In this conclusion we were sustained by the supreme court. 74 Mo. 374. But a remark was incidentally made from which it might be inferred that, in our view, nothing can be made the subject of a lien, whether provided for in the contract or not, which is not visibly incorporated in the structure itself, as it stands when com-

pleted. We wish to be understood as holding, with the authorities above cited, that labor or materials not incorporated in the structure may properly be covered by the lien, if necessary to the work and provided for in the contract. It is only when one of these conditions fails, or both of them, that the objection may prevail. The point is not well taken in the present case, as was properly held by the learned judge of the circuit court.

Many questions which appear to arise on the present appeal have been very ably argued by the counsel on both sides. Their materiality, however, wholly depends on the correctness of the circuit court's ruling on the proper construction of the statute from which the plaintiff infers a right of lien. If it be found necessary to reverse that ruling, the plaintiff's lien claim must fail, whatever may be true of some other propositions on which he relies.

The act provides: "Section 1. All persons who shall do any work or labor in constructing or improving the road-bed, rolling stock, station houses, depots, bridges, or culverts of any railroad company incorporated under the laws of this state, or owning or operating a railroad within this state and all persons who shall furnish ties, fuel, bridges, or materials to such railroad company, shall have, for the work done and labor performed, and for the materials furnished, a lien upon the road-bed, station houses, depots, bridges, rolling stock, real estate, and improvements of such railroad, upon complying with the provisions hereinafter mentioned : provided such work and labor is performed, and such materials are furnished, under and in pursuance of a contract with such railroad company, its agents, contractors, subcontractors, lessees, trustees, or construction company organized for the uses and purposes of such railroad company, or having in charge the building, construction, or improvement of such railroad or any part thereof.

"Sect. 2. The lien aforesaid shall attach to the buildings, erections, improvements, road-bed and property

mentioned, from the date of the commencement of such work and labor, or from the time such materials were furnished or delivered, and shall be prior to all mortgages or encumbrances placed upon the property affected by this lien, subsequent to the passage of this act." Sess. Acts, 1873, p. 59.

This act of the general assembly was approved on the 21st day of March, 1873. Another statutory enactment then in force was as follows: " All acts of the General Assembly shall take effect at the end of ninety days after the passage thereof, unless a different time is therein appointed." Wag. Stats. p. 894, sect. 4.

In the lien act of March 21, 1873, there was no appointment of the time when it should take effect, unless this may be found in the concluding words of section 2, above copied. It was held by the circuit court that, by force of those words, the act went into effect, for all purposes, on the day of its approval. Having carefully read the able opinion given on this point by the learned judge of the circuit court, we think, nevertheless, that his conclusion is inflexibly opposed by the soundest reasoning and authority. There is some attempt to distinguish between the effect of a constitutional regulation fixing the time when acts of the General Assembly shall go into effective operation, and that of a legislative declaration to the same purpose. There is no basis for the distinction supposed. An expression of the legislature's will, within the scope of its constitutional powers, is as absolutely binding on the citizen, and on the courts, as if uttered by the constitution itself. There can be no degrees of comparison between two authorities uttering the same command, where either is entitled to unquestioning obedience.

The act of March 21, 1873, created a method of enforcing the rights of railway contractors, which had never existed before. It established new conditions of ownership in the entire property of railway corporations, rendering it liable to compulsory alienation in newly devised contingencies,

and, to that extent, introduced a radical change in all their tenures and titles.   It gave a new jurisdiction and authority to the courts; empowering them, by forms and processes hitherto unknown, to sweep away, in certain events, all the holdings of an influential business corporation, for the satisfaction of a single creditor.   It provided in an elaborate way for forms of procedure, for duties and conditions to be observed, respectively, by all the parties concerned, including the officers of the courts, and for methods whereby the corporation and its property might be finally released from the judical grasp in contemplation.

All this, and more, the act did, in seventeen sections of compact statutory law, covering three pages of the Session Acts.   As to all the rules of action thus provided for, not a word appears in the act, directly declaring, either in general or in specific terms, when they, or any of them, shall begin to be in force.   We are invited to perceive, however, that inferentially, the time for all these important changes is to be that mentioned in connection with the incidental contingency of possible outside incumbrances which may or may not appear in any case.   This seems to be a clear case, to use a phrase whose peculiar illustrative force may excuse its appearance here, of the " tail wagging the dog.''   We do not think that the legislative intent so appears.   At the same time, it is not to be denied that a different view is here sustained by very able arguments of learned counsel, and by at least one authority which always commands our most profound respect.   All the statutory laws in force at a given time must be construed as if published in a single utterance of the legislative will.   The general provision declaring when all acts of the General Assembly should be deemed to take effect, must be read as if it were a part of every act passed while it continued in force.   If it were thus visibly incorporated in the act under consideration, the effect would be a legislative announcement, substantially, that " this act shall take effect at the end of ninety days

after its passage, if a different time is not herein appointed.'' In the face of such an announcement in the body of the act, would it be very easy to discern in a special provision affecting encumbrances not mentioned anywhere else, an '' appointment '' of the time when the entire system, in all its ramifications, should become a feature in the laws of this state? '' But,'' it will be said, '' the whole object of the statute is to protect railway contractors against liens or encumbrances in favor of other parties. Therefore, a provision which limits by a date the effectiveness of all ' mortgages or encumbrances,' does, substantially and by clear implication, make that date the appointed time when the privileges of the act are to be placed within the reach of the contractor.'' We answer that both the premises and conclusion are unsound. The object of the statute is to enable the contractor to fasten upon the railway property and secure its availability for the satisfaction of his demand at the proper time without waiting to obtain judgment and execution, and without taking the chances of a race with other creditors pursuing a like judgment and execution, or the chances of an absolute alienation by the company of its property before a judgment can be reached. The objection is conclusively answered by the fact that all these prominent objects of the statute may be thoroughly accomplished, even where there are '' no mortgages or encumbrances '' in the case, and therefore nothing for the concluding terms of the second section to operate upon.

Let us suppose a case. A railway contractor makes his contract on the 22d of March, 1873 — one day after the approval of the act under consideration. He finishes the work in a week, and within another week has filed his lien claim and begun his suit upon it in the circuit court. Before the expiration of ninety days after the approval of the act, his case comes up for hearing and adjudication. The defendant objects, by demurrer or otherwise, that no law is yet in force which entitles the plaintiff to the relief

asked for — citing the ninety days' provision above quoted. The plaintiff responds by showing from the second section, that his lien (when authorized and perfected according to the act, if this be in force) " shall be prior to all mortgages or encumbrances placed upon the property  *  *  *  subsequent to the passage of this act." It appears, however, that there are no mortgages or encumbrances in the case, and no reason for supposing the existence of any. The presiding judge, therefore, does not see why he should concern himself about this particular provision, since it touches no fact, right, or priority involved in the issues before him. But the plaintiff is not yet discouraged. He shows the court that the provision must be construed to mean the taking effect of the entire act at the date of its approval, because otherwise, upon its taking effect only at the end of ninety days, its treatment of mortgages and encumbrances, reaching back to the date of approval, would be retroactive, and therefore unconstitutional and void. The court would find no difficulty in this position. Without hesitation, it would decline to pass upon the supposed constitutional question, until that should distinctly arise in a contention concerning the alleged priority of a mortgage or encumbrance coming within the terms and intent of the provision. No such contention being yet present, the provision must stand for what it clearly expresses, and no more. It certainly does *not* express, in words which the law-maker would naturally use to that end, that the entire act shall be in force from and after its passage. The court would therefore be compelled to fall back on the ninety days' provision, whose general terms are direct and unmistakable, and are not qualified in the alternative way for which it stipulates. That such would be a correct conclusion in the case supposed, seems to be unquestionable. If then, it would involve a proper determination of the time when the lien act was intended to become operative, how could it be said in another

case that, because of a different state of facts, the law was intended to go into effect at a different time?

The supposed constitutional difficulty, however, may be met squarely. It is not unusual, when a particular statutory provision, by reason of its comprehensiveness, is found to be in collision with the constitution, to limit its effect, if this may be done by a reasonable interpretation, so as to bring its operation within the constitutional powers of the legislature, and thus give due effect to the legislative intent in the whole enactment. This is done upon the presumption that the legislature intended to act within the limits of its constitutional authority, and it is the duty of the courts to carry out that intent, so far as it may be done without violence to the manifest purposes of the law-making power. Interpretation, in such a case, belongs to the particular provision which is brought into question. But we know of no precedent for wresting an entire act, having numerous and comprehensive functions, from the sphere to which it has been assigned by an imperative rule of legislation, in order to make a single sentence mean what it falls far short of saying, and so to avoid a possible abrasion of the constitution. In those states where constitutional or statutory rule prevails, postponing the time when the legislative enactments shall go into effect, if no time is otherwise appointed, it has been repeatedly held that, to take an act out of the general terms of the regulation, there must be a direct and explicit declaration of the legislative intent to that effect. Thus, in *Wheeler* v. *Chubbuck* (16 Ill. 361): " But such direction must be made in a clear, distinct, and unequivocal provision and can not be helped out by any sort of intendment or implication. * * * Wherever it is designed that a law shall go into force before the expiration of the sixty days, we universally find a separate clause at the end of the act, of the following purport. ' This act to take effect and be in force from and after its passage.' In the law in question there is no distinct clause declaring

when the act, as a whole, should take effect, and become
an operative law.    It is true that the act says, that after
the first day of March next, certain acts should not be
done.    *   *   *    In order to take an act out of the consti-
tutional provision, the legislature must direct that the act,
as a whole and entirety, shall take effect at a different time ;
and it is not sufficient that certain parts of it might bear a
construction which would, taken separately, give those
parts effect at an earlier period." That case furnishes a
very close parallel to the one before us.  Its ruling was
re-affirmed and applied by the same court in *Board of
Supervisors, etc., v. Keady* (34 Ill., 293).   The consti-
tution of Arkansas ordains that, " no public act shall take
effect or be in force, until ninety days from the expiration
of the session at which the same was passed, unless it was
provided otherwise in the act."    An act of the legislature,
approved July 21, 1868, provided for the issuing of cer-
tain bonds in aid of railway construction, and directed,
among other things, that a poll should be opened "at the next
general election, to be holden under the provision of section
3, article XV. of the constitution of this state," wherein
the ballots of the electors should determine their acceptance
or rejection of the law.    An election was duly held at the
time thus appointed.    But the supreme court held that the
election was void, because the ninety days had not expired
after the end of the session at which the act was passed ;
thus refusing to consider the fixing of an election within the
specified period, for the express purpose of giving effect to
the law, as any indication of the legislative intent to
" provide otherwise in the act " for the time when it should
go into operation.   *The State* v. *Railway Co.* (31 Ark. 701).
This seems to be a much stronger case than the one to
which we are here asked to apply a contrary method of
interpretation.    Reference is made to *Baker* v. *Compton*
(52 Texas, 252).    We do not find the case clearly in point.
It is apparent from the opinion of the court that the whole

act under consideration would have been found to be virtually inoperative, unless a literal effect was given to the section which directed certain duties to be performed " from and after the passage of this act." It is already shown that such a result is not to be apprehended with reference to the act we are here considering. The Texas court, however, seems to base its conclusion chiefly on the proposition that " the later act being complete in its provisions, must control;" and thus finds occasion to distinguish between a legislative regulation for the taking effect of statutes, and one prescribed by the constitutional law. That there is such a distinction as to the powers of the legislature, no one will dispute. But when it comes to a question of interpretation by the courts, of the intent of the law maker, there is none whatever. The legislative intent, within the scope of its acknowledged authority, must be sought within the same boundaries of interpretation that would apply to an utterance of the organic law. There is certainly no need of considering any question of legislative power, when the ninety-day rule itself preserves in the legislature the privilege of fixing in a statute any different time for its taking effect. Nor need we entertain any question of " repeal by implication." The only inquiry here is, whether the legislature did really intend to fix a time different from that declared in its own general rule, for the taking effect of the act under consideration. This brings us to a method of discovering the legislative intent, which is more reasonable than that proposed by the plaintiff in this case, and which is sanctioned by precedents of high authority. Let it be conceded that the words " passage of this act " have reference in their ordinary acceptation, to the date of its approval by the governor. " In the construction of statutes, the intent of the legislature should be carried into effect, and the spirit of the enactment preserved, if practicable. Under this rule, the letter of a statute is frequently sacrificed to

the general purpose and intent of the act." *Kennedy* v. *Kennedy*, 2 Ala. 571. The Iowa constitution provided that "no law of a public nature shall take effect until the same shall be published and circulated in the several counties of this state, by authority. A law concerning homesteads was embodied in the code, which was approved by the governor on February 5, 1851, but went into effect, under the constitutional provision, on July 1, 1851. It contained a provision for sales "on execution for debts contracted prior to the passage of this law." The supreme court held that the words "prior to the passage" amounted to the same thing as if the legislature had used the word "heretofore," and that either expression must relate to the time of taking effect, and not to the time of passage. *Charless* v. *Lumberson*, 1 Iowa, 435. In *Rogers* v. *Vass* (6 Iowa, 405), the same court held that, "The provision in the act, entitled, 'An act in relation to the swamp lands of this state,' approved January 24, 1857, which provides that the act shall not apply to the actual settlers on said lands at the time of the passage of the act, has legal reference to the time of the taking effect of the act, and not to the time of its passage." An application of this rule to the second section of the act before us, is, in our estimation, the most rational way of giving effect to all the purposes of the legislature, as they appear in the statute, within the scope of its constitutional powers. As was said in *Jackman* v. *Garland* (64 Me. 133), "An act is of no force until it becomes a law." We follow this rule, and give full effect to the undisputed authority of the legislature over mortgages or encumbrances "placed" after the taking effect of the law. The most that can be said on the other hand is, that we apply to the legislation thus controlling encumbrances, a limit as to *time*, which we find prescribed by the constitution in its inhibition of retrospective laws. Not that we might, in any event, substitute a constitutional enactment for one that we deem unconsti-

tutional.   We mean only to show that our interpretation of the legislative intent is in harmony with the law of the constitution.   We are of opinion that the act of March 21, 1873, did not become operative as a law, until ninety days after the date of its approval.   We can not ignore the fact, however, that in *Walker* v. *Railroad Co.* (2 Cent. L. J. 481), Judge Dillon announced a different ruling.   " The phrase," he says, " ' subsequent to the passage of this act,' means subsequent to the approval by the governor."   No argument or reasoning is offered in support of that eminent jurist's conclusion, further than a citation of authorities, showing what is usually understood by the " passage " of an act.   We have no occasion to question the customary application of this term.

. The defendant tunnel company executed a mortgage trust deed to Barton Bates and Charles Tracy, trustees, dated January 1, 1873, conveying its entire property, then held or thereafter to be acquired, to secure the payment of one thousand two hundred and fifty bonds, of £200 sterling each, to be thereafter issued and sold or hypothecated for money to be used in building the tunnel and railway.   This deed was duly placed on record on February 6, 1873.   J. S. Morgan & Co., of London, made advances to the tunnel company on this security to the amount of £100,000, prior to March 22, 1873, and to the further amount of £50,000 within the ensuing two months.   In pursuance of a decree rendered by the United States circuit court of St. Louis, the tunnel and railway property was sold in foreclosure of the same mortgage, on the 1st day of July, 1878, and was purchased by Tracy, who had become sole trustee, for the benefit of the bondholders, at the price of $450,000.

The plaintiff in the present case completed his work on or about October 22, 1874, and filed his lien claim on January 18, 1875.   He began his suit on March 19, 1875, and this was finally determined on January 2, 1884, in a judgment to the following effect:   The plaintiff recovered the amount

claimed in his petition, with a lien under the act approved March 21, 1873, " for the whole amount of the damages assessed in his favor as aforesaid, on and against the railroad of said St. Louis Tunnel Railroad Company and its property," etc.   It was further found that the plaintiff's lien was prior and superior to the lien of the trust deed above mentioned, except as to such amounts as were shown to have been advanced on the faith thereof, prior to the 22d day of March, 1873, with commissions and interest; and that, as to all other amounts, the trust lien was subsequent to the plaintiff's.   It was thereupon determined from the evidence that the trust lien priority amounted to $485,000 (being the equivalent of £100,000 sterling) with interest and commissions, etc.   Then followed an award of special *fieri facias*, in usual form.

It seems to be conceded that the trust lien should prevail to the extent of all advances made by the beneficiaries before the act of March 21, 1873, went into effect.   Our ruling with reference to this act merely adds £50,000 value to the equity of redemption, if the circuit court rightly held that this was open to the plaintiff's execution.   But on this point, also, we find ourselves compelled to take a different view from that held by the learned judge of the trial court. We think that the foreclosure and sale shown in the record vested a complete title in the purchaser, unencumbered by the lien claimed for the plaintiff.

In the case of an ordinary common-law mortgage, no absolute ownership can be acquired by the mortgagee, or any purchaser claiming under his right, without a decree of foreclosure in equity.   Such a decree, upon obvious principles, binds nobody having any interest in the property, who is not a party to the proceeding.   This is the utmost, for the purposes of the present controversy, that can be gathered from *Haynes* v. *Beach* (3. Johns. Ch. 459), and other adjudications which are strongly urged upon our attention by able counsel, in the plaintiff's behalf.   But the

courts and the profession have long been familiar with a class of mortgage securities which foreclose themselves, without the intervention of any court. Such are mortgages and deeds of trust with a power of sale in the grantee. The instrument proclaims upon its face how, for the purpose of satisfying the debt secured, an absolute title may be acquired against all the world. Registration makes the method known, with its ordained results, to all the world; so that no claimant of rights arising after that fact may dispute a title perfected in conformity with the conditions of the original deed. This is familiar law, and needs only a direct application to the case before us.

The trust deed of January 1, 1873, directs that, in the event of certain defaults specified, " the said trustees may thereupon, * * * proceed to make sale of the said premises, or so much thereof as may be necessary to pay the amounts then due on said bonds. Such sale shall be made at public auction to the highest and best bidder therefor, at such public place in the city of St. Louis as the said trustees may determine. Notice of the time and place of such sale shall be published at least once a week for six weeks previous thereto, in daily newspapers printed in the cities of St. Louis, New York, and London, and whenever and however else shall be required by law. Upon the completion of such sale, the said trustees shall convey to the purchaser by a good and sufficient deed all the said premises conveyed by these presents.

" *Fourth.* Nothing herein contained shall be construed to limit the right of the trustee, or any holder of any of said bonds, upon default being made in the payment of the interest or principal thereof, or in the performance of any agreement in said bonds contained, to proceed by suit or action at law or in equity, to enforce payment and satisfaction thereof. And any and every sale made under and by virtue of these presents, or of any judgment or decree of foreclosure thereon, shall be absolute and without redemption,

and shall be a perpetual bar at law and in equity, to all claims and rights of said company of, in, and to said premises and each and every part thereof; and said company hereby waives all right of redemption, valuation, and appraisal of the same under laws of the state of Missouri, now or hereafter in force, in order that an absolute and perfect title may be made to the purchaser thereof on such sale. And the purchaser on any such sale shall not be bound to inquire into the necessity or expediency thereof, or to the application of the proceeds thereof by said trustees."

The record shows that, in January, 1878, Tracy, sole trustee, filed a cross bill in the United States circuit court, reciting, among other things, the trust deed above mentioned and the facts constituting sundry defaults of the tunnel company, and praying for a decree of foreclosure and sale according to the terms of the deed. The result of this proceeding was a decree which, after reciting the stipulations of the trust, the default, and the amount of the indebtedness, with other matters pertinent, appointed Ezekiel K. Woodward a special commissioner to sell the mortgaged property upon the notice, and in every particular of time, place, and manner, in exact accordance with the directions contained in the deed. As appears by his report, and the recitals in his deed to the purchaser, the commissioner followed these directions to the letter, and so sold and conveyed the property, as already stated. It thus appears that everything was done that the trust deed required to be done, in order to make a sale and conveyance "absolute and without redemption," "a perpetual bar at law and in equity," and "in order that an absolute and perfect title" might be made to the purchaser. It may be said that there was a departure from the deed, in the intervention of a commissioner appointed by the court, to do what was devolved upon the trustee. But this in fact was no departure, and if it were one, it would make no difference in the result. Much stress is laid by learned counsel on the fact that

the sale was made under a judicial decree of foreclosure, instead of upon the personal motion of the trustee. The fact makes no difference whatever. The judicial decree, as an eligible alternative in the option of the trustee, was as much a specific feature in the methods prescribed by the trust deed, as was the advertisement in a London newspaper. It was a part of the plan agreed upon to accomplish an intended result. How could it concern that result, when both methods were offered in the alternative, whether the sale and conveyance were brought about by the will of the trustee alone or by an order of court procured by his instigation, and upon his prayer, in literal accordance with the same plan? The permission given for a resort to the court necessarily involved a consent to its ordinary modes of procedure. The appointment of a special officer to carry out its decree in the forms prescribed was, on the face of the deed, in contemplation of the parties.

It could not have been expected that the court, in the proceeding provided for, would appoint the plaintiff trustee, a party on the record, to execute its judgment. The effect of the transfer, as "absolute and without redemption," was attached by the plain terms of the deed to "any and every sale made under and by virtue of these presents, or of any judgment or decree of foreclosure thereon."

Here is no case of an ordinary mortgage which simply conveys property with a defeasance of title upon the payment of a debt. By ancient and modern usage, such an instrument is considered as leaving open certain questions of fact to be determined by a court of equity, before the grantor can be absolutely deprived of his property. Is the debt still due; and if so, in what amount? How much of it has been paid? Has there been a default, or is the debt not matured? These and other vital questions are referred to no arbitrament designated by the instrument. They belong, therefore, to the courts. Litigation and adjudication must settle them, and so the settlement binds none but parties to it. But all these

incidents are foreign to a deed like the one shown in this controversy, which in various ways selects and appoints the arbiter and agent for both parties, who is first to decide upon a demand for action, and then to consummate the absolute transfer for which the deed itself has distinctly prepared the way. In the first class of cases, the judicial decree is the prime mover and efficient cause of the final transfer. The mortgage, utterly helpless without it, figures as little more than an auxiliary. In the second class, the deed itself conveys the property absolutely, through agents and instrumentalities of its own appointing. That such was the effect given to the deed in this case by the able and careful judge of the United States circuit court, is manifest from the form of his judgment. This declares: " That in default of and unless, etc., * * * said St. Louis Tunnel Railroad Company and the other defendants in this suit, and all persons claiming by or under them, or either of them, subsequent to the commencement of this suit, and all other persons not parties to this suit who, having liens or claims on said mortgaged premises by or under and subsequent judgment or decree, either as purchasers or encumbrancers, or otherwise, do stand absolutely debarred and foreclosed of and from all equity of redemption of, in, and to the said mortgaged premises, property, and franchises; and that the said railroad, its tunnel and the property and appurtenances, together with the franchises of the said St. Louis Tunnel Railroad Company described and included in said mortgage or deed of trust * * * be set up and sold," etc.

The plaintiff made his contract and entered upon the work with full notice, on the face of the recorded deed, of all these possibilities. There was no more need of his being a party to the formal proceeding in court, than there was of his participating in any other instrumentality for divesting the property, whereof he was warned by the registration. There is sometimes heard a suggestion of hardship in the

possibility of a contractor's losing the fruits of his labor, in the wresting from him of the very property which that labor has brought into being, for the benefit of the mortgage bondholders. It should be remembered that the bondholder has already furnished the money which was to compensate the contractor, and can hardly be responsible for its failure to reach him. Each party consents that the fund be intrusted to the skill and fidelity of the corporation managers, for the just compensation of the one, and the perfecting in the completed work, of an available security for the other. If by any means these purposes fail, the respective rights of the parties must be adjusted by established rules of law. *Qui prior est in tempore, potior est in jure.* Little need be said about the validity of a mortgage upon property not yet existing, to secure bondholders by means of whose advances the property is to be created. The judgment below sustains it in this case, and the plaintiff, in asking for an affirmance, concedes the correctness of that ruling. The zeal and industry of the defendant's learned counsel has furnished us with many authorities to like effect, and we believe it to be the law. Our statute expressly authorizes railway corporations to issue bonds for work to be done on their roads, secured by mortgage on the whole structure; and we are not to suppose that the legislature intended to introduce a class of valueless securities. Rev. Stats., sect. 765.

The judgment of the circuit court is reversed, and a general judgment will be entered here for the amount of the plaintiff's money demand against the tunnel company ascertained below. All the judges concur.