# Lane *v.* Kolb.

*Statutory Proceeding against Officer, to compel Delivery of Books and Papers to Successor.*

1. *Commissioner of Agriculture; term of office; filling vacancy.*—By statutory provisions of force on the 18th February, 1891, the Commissioner of Agriculture was appointed by the Governor, and held office for the term of two years, and until his successor was elected and qualified (Code, § 130); and the statute approved on that day, entitled "An act to make the office of Commissioner of Agriculture elective," provided, "that the office of Commissioner of Agriculture be hereby declared an elective office, and that at the general election in 1892, and every two years thereafter, there shall be elected one Commissioner of Agriculture, whose term of office shall be two years" (Sess. Acts 1890-91, p. 1213). *Held,* that this statute did not create an immediate vacancy in the office of commissioner, and that on the expiration of the incumbent's term, September 1st, 1891, the Governor had the right and power to fill the vacancy by appointment, until the next general election in August, 1892. McCLELLAN and COLEMAN, J. J, *dissenting,* held that the statute created an immediate vacancy in the office, and that the vacancy could only be filled by a special election.

APPEAL from the Probate Court of Montgomery.

Heard before the Hon. F. C. RANDOLPH.

This was a statutory proceeding by petition, instituted by Hector D. Lane against Reuben F. Kolb, to compel the delivery of the books, papers, &c., belonging to the office of

Commissioner of Agriculture, of which Kolb was in possession as incumbent, and which Lane claimed as his successor in office under appointment by Governor Jones, which was made on the 1st September, 1891.  The probate judge dismissed the petition on the hearing, on the ground that Lane showed no right to the office; and his judgment to that effect is here assigned as error.

WATTS & SON, for appellant.—The only methods of taking away from the Governor the right to appoint a Commissioner of Agriculture, as given in Section 130 of the Code, are either by an express or implied repeal of the section; and it is clear that the act of February 18, 1891, does not expressly repeal said section.— *Ogburne v. Ogburne;* 60 Ala. 610 ; *Maxwell v. The State,* 89 Ala. 159 ; nor does said statute repeal section 130 by implication, for the law never favors a repeal of statutes by implication, unless the repugnance is clearly apparent, and the laws are in irreconcilable conflict.— *Wyman v Campbell,* 6 Por. 231 ; *George v. Skates,* 19 Ala. 738 ; *Smith v. Speed,* 50 Ala. 279 ; *Ivers v. State,* 52 Ala. 172 ; *Ogburne v Ogburne,* 60 Ala. 619 ; *Parker v. Hubbard,* 64 Ala. 207 ; *Bradley v. State,* 69 Ala. 322 ; *Cook v. Meyer,* 73 Ala. 583 ; *Roberts v. Pippen,* 75 Ala. 107 ; *Enloe v. Reike,* 56 Ala. 505 ; *Jackson v State,* 76 Ala. 28 ; *Abernathy v. State,* 78 Ala. 411 ; *Gunter v. State,* 83 Ala. 96 ; *Maxwell v. State,* 89 Ala 150 ; *Zaner v. State,* 90 Ala. 653. The only person, whose duty it was to construe section 130 as amended by the act of February 18, 1891, was the Governor, whose duty it was to execute said law, and his construction ought not to be overruled without cogent reasons. *Hill v. State,* 1 Ala. 561 ; *Montgomery Advertiser v. Burke,* 82 Ala. 383 ; *S. & N. R. R. Co v Gilliam,* 85 Ala. 171 ; *Brown v United States,* 113 U. S., 571.  No law should be so construed as to interfere with the public business, the public convenience and the welfare of the State, if such a construction can, without a violation of settled rules of interpretation, be avoided.  Enlich on Interpretation of Statutes, § § 245, 258 and 264.  The appellee could not hold over under the authority of the clause "and until his successor is appointed and qualified," as found in section 130. *Hughes v. City Council of Montgomery.* 65 Ala. 201 ; *Clemmsford v. Demorest,* 7 Gray ; *Dover v. Twombly,* 42 N. II. 59. It can not be said that the Governor had no right to appoint, at the expiration of Kolb's term of office, because the legislature intended Kolb to serve out his term, and until his successor was elected and qualified, because (1.) The power

[Lane v. Kolb.]

to elect and appoint, includes a power to fill vacancies. Lawson's Rights, &c. 3809 ; 5 Wait's Actions and Defenses, p. 2, § 2 ; *State v. City of Newark*, 3 Dutcher 185 ; *Graham v. Campbell*, 2 Cal. 135. (2.) At common law a public officer, chosen for a definite time could not continue to hold the office on a failure to elect a successor, and a statute is required, providing that the incumbent hold until his successor is qualified. 5 Wait's Actions and Defenses, § 12, p. 11 ; *People v. Tiedman*, 30 Barb. 193 ; Smith on Statutes, p. 902, § 783. (3.) A term of office commences at the election or appointment, unless a different time is fixed by the law creating the office ; and the term ends on the expiration of the time for which the officer was elected or appointed, or upon the appointment or election of his successor. Lawson's Rights, Remedies & Practice, 3806 ; 5 Wait's Actions and Defenses, p. 2. If the act of February 18, 1891, made the office of the Commissioner of Agriculture elective on its approval, there was a vacancy created in the office of Commissioner of Agriculture by its approval.—*McAfee v. Reynolds*, 44 Ala. 240; *State v. Taylor*, 31 Ala. ; *Ex parte Lambert*, 52 Ala.

BRICKELL & GUNTER and J. M. WHITE, *contra*.—There is no inherent power in the Governor to appoint officers and fill vacancies, and if such power exists at all, it must exist by virtue of the Constitution, or by expressed statutory provisions.—Mechem on Pub. Of., § 108 ; *State v. Noble*, 118 Ind. 350 ; *Mayor v. State*, 15 Md. 376 ; 74 Am. Dec. 572 ; *Commonwealth v. Hanley*, 9 Pa. St. 513 ; *State v. Irwin*, 5 Nev. 111 ; *State v. Swift*, 11 Nev. 128. The legislature having conferred the power on the Governor to appoint a Commissioner of Agriculture, can modify, control or absolutely withdraw such power from him.—Mechem on Public Offices, §§ 109, 465. In this State the rule prevails that all statutes, other than penal statutes, take effect on the day of their approval by the Governor, or from the day when all the formalities of enactment are complete, if there be not some other time expressed in the particular statute.—*Taylor v. State*, 31 Ala. 383 ; *State v. Click*, 2 Ala. 26 ; *Wood v. Fort*, 42 Ala. 642 ; *Weatherford v. Weatherford*, 8 Port. 171 ; *Rathbone v. Bradford*, 1 Ala. 312 ; *Br. B. Mobile v. Murphy*, 8 Ala. 119 ; 7 Lawson R. & R. Pr., 3764 ; Cooley on Con. Lim., 188; Suth. on S. Con., Sec. 104. If the particular statute is silent as to the time when it shall take effect, the postponement of its operation until a day beyond its enactment is not to be gathered or worked out by intend-

ment and inference.—Cooley on Con. Lim., 188 ; *Matter of Howe,* 112 N. Y. 100 — *Wheeler v. Chubbuck,* 16 Ill. 361 ; *Board of Sup. v. Keady,* 34 Ill. 293 ; *Swan v. Buck,* 40 Miss. 303.

When the language of a statute is definite and has a positive meaning, it must be presumed to declare the intent of the legislature, and the language being clear and unambiguous, courts, in construing it, can not go beyond or outside of the language of the statute, under the pretext of curing any supposed blunder of the legislature.—Sutherland on Statutory Construction, § 238 ; *Johnson v. Hudson R. R. Co.,* 49 N. Y. 455 ; *McCluskey v. Cromwell,* 1 Kerm. 593 ; *Bartlett v. Morris,* 9 Por. 266 ; *Bradbury v. Wagerhorst,* 54 Pa. St. 180. That great inconveniences and serious results might result from making the office of Commissioner of Agriculture elective before August 1892, can not thwart the clear legislative intent.—Sutherland on Statutory Construction, § § 238, 430, 431. Under the provision that " until his successor is appointed and qualified " the office would not become vacant until there was an appointment or election and qualification of the successor under the method prescribed by law.—Mechem on Pub. Off., §§ 128 and 397 ; *People v. Tilton,* 37 Cal. 614 ; *Commonwealth v. Hanley,* 9 Pa. St. 513 ; *State v. Harrison,* (113 Ind.) 3 Am. St. Rep. 666 ; *State v. Howe,* (25 Os.) 13 Am. Rep. 321 : *State v Lusk,* 18 Mo. 333 ; *People v. McIver,* 68 N. C. 467 ; *Plowman v. Thornton,* 52 Ala. 559.

STONE, C. J.—The office of Commissioner of Agriculture is not provided for by the Constitution. It is the creature of statute. Before the act of February 18, 1891, the Commissioner was appointed by the Governor, under section 130 of the Code of 1886. Its provisions are, " The Commissioner of Agriculture is appointed by the Governor, and holds office for the term of two years, and until his successor is appointed and qualified." Under this statute the Governor, on September 1, 1889, appointed R. F. Kolb to the office. Kolb qualified and entered upon the duties of the office. He was in the discharge of its duties when the statute hereafter copied was enacted, and remained in office without molestation, until the expiration of two years from the date of his appointment.

On February 18, 1891, the act was approved " To make the office of the Commissioner of Agriculture elective." Sess. Acts, p. 1213. Its provisions are :

§ 1. " That the office of the Commissioner of Agriculture be hereby declared an elective office, and that at the gene-

ral election in 1892, and every two years thereafter, there shall be elected one Commissioner of Agriculture, whose term of office shall be two years."

§ 2. " That all laws and parts of laws in conflict with the provisions of this act be, and the same are hereby repealed."

At the end of two years from Kolb's appointment—to wit, September 1, 1891—the Governor appointed H. D. Lane to the said office of Commissioner, who gave the bond and took the oath prescribed by law, and was commissioned as such. He thereupon made a demand in writing on Kolb of " the moneys, papers, books, and other property belonging to the office of Commissioner of Agriculture." This demand was refused, and the present proceedings were then instituted for the recovery of the same. The probate court decided that Lane was not entitled to recover, and dismissed his petition. From that decision the present appeal was taken.

There is no issue of fact presented by the record, but the determination of the issue before us depends on the proper interpretation of the statutes. Appellant contends that by the terms of the statute of February 18, 1891, the Governor's right of appointment is not displaced until the time fixed for holding the first election—August, 1892. The appellee takes issue on this claim, and contends that the Governor's power of appointment was taken away, *eo instanti*, by the approval of the later statute.

No general power of appointment has been conferred on the Governor of Alabama, either by the Constitution or by statute. It is not one of the inherent, executive functions, and hence unless the power to appoint is expressed in some statute, it does not exist. So, in this case ; unless the power of appointment conferred by section 130 of the Code remains of force until August 1892, the time for holding the first election under the act of February 1891, the appointment of Lane was without authority and is void.

When an office is not provided for by the Constitution, but is the creature of statute, there is no element of contract between the officer chosen and the public, or constituent body which confers the office. Being created, and its functions and emoluments conferred, by the legislature, the same body may abolish it, take away or reduce its functions and emoluments, or make any change its wisdom or caprice may suggest, not inhibited by the organic law.—Mechem Pub. Officers, § 465. In *Prince v. Skillin*, 71 Me. 361, it is said that, " All offices, except when legislative authority is

[Lane v. Kolb.]

limited or restricted by constitutional provisions, are subject to the will of the legislature. There is, with the above exception, no vested right in an office or its salary. The office may be abolished. The mode of appointment may be changed. The length of time of official existence may be shortened. The compensation for official services may be diminished." To the same effect are *Butler v. Pennsylvania,* 10 How. 402; *Taft v. Adams,* 3 Gray 126; *Connor v. Mayor,* 5 N. Y. 285; *People v. Devlin,* 33 N.Y. 269; s. c. 88 Amer. Dec. 377; *Com. v. Bacon,* 6 Serg. & R. 322; *Barker v. Pittsburgh,* 4 Penn. St. 49; *People v. Wilson,* 72 N. C. 155; *Bunting v. Gales,* 77 N. C. 283; *Rhodes v. Hampton,* 101 N C. 629; *State ex rel. v. Davis,* 44 Mo. 129; *Wilcox v. Rodman,* 46 Mo. 322; *Bryan v. Cattell,* 15 Iowa 538; *Atty-Gen. v. Squires,* 14 Cal. 12; *Bulger v. Merrill,* 45 Cal. 553; *State v. Douglas,* 26 Wis. 428.

The inquiry, at what time the act of February 18, 1891, went into practical operation, is the pivotal question in this case. In ascertaining the meaning of a statute, as of most other writings, the first law of interpretation is that we must search for the meaning in the words employed, assisted, if necessary, by the facts and conditions which existed at the time of the enactment of the statute, or the making of the contract we are called on to interpret. Intention is not a subject of proof, in the ordinary sense, but must be gathered from the language employed, and the attendant facts. These, it must be conceded, furnish the safest guide to the end sought for—the ascertainment of the intention with which the act was done. Attendant facts, as well as consequences, may be looked to in the interpretation of statutes.—Endlich on Interpretation of Statutes, §§ 245, 251, 258, 264; *Huffman v. State,* 29 Ala. 40; Sutherland on Stat. Con., § § 238, 323.

In construing a statute, we should not, unless compelled thereto by unbending language, reach the conclusion that the legislature intended to do an act which would lead to public inconvenience or detriment, to a suspension or failure of official functions, or to a defeat of the object they must have had in contemplation. " It is always to be presumed that the legislature intends the most beneficial construction of their acts when the design of them is not apparent." This was the language of the distinguished Chief Justice Parsons in *Richards v. Dagget,* 4 Mass. 534. In *Somerset v. Dighton,* 12 Mass. 383, the court said, " In some cases the letter of a statute may be restrained by an equitable construction; in others enlarged; and in others the construction

[Lane v. Kolb.]

may be even contrary to the letter."—In *Smith v. The People*, 47 N. Y. 330, the court employed the following language : " In the construction of statutes effect must be given to the intent of the legislature whenever it can be discerned, though such construction seem contrary to the letter of the statute. That intent must be primarily sought in the language of the statute, and if the words employed have a well understood meaning, are of themselves precise and unambiguous, in most cases no more can be necessary than to expound them in their natural and ordinary sense. The words in such case, ordinarily, best declare the intention of the legislature. These rules are elementary, but it is equally well settled that words, absolute of themselves, and language the most broad and comprehensive, may be qualified and restricted by reference to other parts of the same statute in which they are used, and to the circumstances and facts existing at the time, and to which they relate, or are applied. A literal interpretation of words in most common use, and having a well defined meaning as ordinarily used, would not unfrequently defeat rather than accomplish the intent of the party using them. If in reading a statute in connection with other statutes passed at, or about the same time, a doubt exists as to the force and effect the legislature intended to give to particular terms, that is as to the meaning which it was intended they should bear and have in the connection in which they are used, it is also competent to refer to the circumstances under which, and the purposes for which a statute is passed, to ascertain the intent of the legislature. The ground and cause of the making of the statute explain the intent."—In *Stewart v. Keemle*, 4 Serg. & R. 72, the court said, " There is no rule in the construction of statutes of the inflexible nature contended for by the counsel for the defendant in error ; that without relation to the other parts of the acts, or the whole system of laws ; without relation to the unjust and absurd consequences, that would flow from a literal adherence ; without relation to the clear scope and design of the act, courts must adhere to the the very words and letter of the law ; for the letter of a statute will be enlarged or diminished, according to legal discretion, so as to embrace all the purposes designed by it."—In *Hoke v. Henderson*, 4 Dev. Law 1, s. c. 25 Amer. Dec. 677, that great and sterling jurist, Chief Justice Ruffin, declared that, " In construing an instrument the cardinal point is to ascertain the meaning of those who speak in it from the words used by them, and the objects apparently to be effected. This is the rule for the construction of statutes, as

well as other instruments, and it is the duty of the court, to-
whose province it falls, according to the distribution of the
powers of government in this country, to interpret statutes,
to put a fair meaning upon the language of the legislature,
in order to effect, as far as they are constitutionally allow-
able, the ends in view."—In *Neenan v. Smith*, 50 Mo. 525,
it was decided that, in construing a statute, reference must
be had to its object, and it will not be presumed that the
legislature attempted to authorize a proceeding unreasona-
ble in itself, unless the intention is indicated in .express.
terms." In *Blakeney v. Blakeney*, 6 Por. 109, this court
said, " To construe a statute according to its equity is noth- :
ing more than to give effect to it, according to the intention
of the law makers, as indicated by its terms and purposes.
Hence it may either be extended or restrained by an equit-
able construction."— *McCloskey v. McConnell.* 9 Watts 17 ;
*People v. Wilson*, 72 N. C. 155 ; *Plumstead v. Spackman*,
L. R. 13 Q. B. 878.

It is said that when words are plain and unambiguous,
there is no room for construction.  That is true in the sense
intended, but it has limitations.  All words spoken in one's
own tongue may, in one sense, be said to be plain and
unambiguous.  It is when combined into sentences that they
enter the field of interpretation, and the attendant facts, the
consequences then become important factors.  We can not
admit there is any inflexible rule, that when words, on their
face, and construed by themselves, appear to have a plain
meaning, there is then left no field of operation for the doc-
trine of construction.  Nothing is perhaps more frequently
misunderstood than language often is, which, at first blush,
appears to be plain, if considered by itself.  The subject, the
occasion, the surroundings and the end to be .accomplished
must be steadily kept in view.  Language, though plain and
unambiguous when considered by itself, has a very different.
intent and meaning when employed in certain supposable
conditions, from that we would readily accord to it, when
expressed with other surroundings and aims.  Language is,
at best, an imperfect vehicle of thought.  Wills and other
important documents prepared by the greatest legal and
judicial minds of the world, have perhaps given rise to as
great contrariety of interpretation, as any other subject of
juridical contention.  How, then, can we say of any statute
which undertakes to modify or change the existing state of
things, that we can safely arrive at the intention of the law-
making power, without considering the status or condition of
things to which it relates ?  How can we arrive at the

·changed status, without first considering the status intended to be changed? Can we safely undertake to declare the intention of a legislative enactment, without considering the attendant circumstances, and its probable operative effect? When a statute is amendatory or alterative of existing con- ·ditions, we should so construe it as to produce as little fric- tion in the transition, as the words employed will permit.

Pursuing the methods suggested, the chances are greatly multiplied that we will be conducted to the goal sought for by all legitimate inquiry—the ascertainment of the legisla- ·tive intent. All rules of interpretation are framed with a view to that end. We think the language of the statute we are considering falls very far short of reaching that high standard, which precludes all inquiry into the intention with ·which it was enacted.

But if we are mistaken in our proposition, and the natural interpretation of the statute we are considering be so clear as *prima facie* to bar all outside inquiry, this is not abso- lutely conclusive. All members of the legal profession will ·recall the illustration, stated to be drawn from the jurispru- ·dence of ancient Rome, which Sir William Blackstone gives, when considering the rules of statutory interpretation. A Roman edict or law had denounced a heavy penalty against any· one who shed human blood in the streets of the city. An epileptic fell in a paroxism in the street and blood-let- ting was resorted to for his relief. The question was, whether this was a violation of the penal law. It was plainly ·within its letter, but was declared not to be within its spirit. I cite from memory, without assuming to be verbally accu- rate.

The language of the act of February 18, 1891, is "That the office of Commissioner of Agriculture be hereby declared an elective office." This speaks in the present tense; and in-as-much as statutes, under our system, go into immediate operation, unless a different intention is expressed, it is held by my dissenting brothers, that the enactment of the statute operated a total repeal of section 130 of the Code of 1886. Let us inquire to what results this would lead, if we must adopt this construction.

Section 130 of the Code is, as we have said, in the follow- ing language: "The Commissioner of Agriculture is appointed by the Governor, and holds office for the term of two years, and until his successor is appointed and quali- fied." The most pronounced effect would be to declare that the then incumbent of the office would be ascertained to be ·in without any existing authority of law. The office itself,

[Lane v. Kolb.]

its functions and emoluments, being of legislative creation, and, therefore, subject to legislative modification or repeal, a plausible argument may be formulated that when the authority under which he received his appointment was repealed, the office tenure would fall with it. This would lead to a vacancy in the incumbency of the office, until an election could be held under the new law.

Even if the repeal of section 130 of the Code be held not to oust the incumbent until the end of his term of two years, the office would become vacant at that time—September 1, 1891. This because, first, the repeal of section 130 would carry with it the repeal of the last clause of that section—the clause which declares that the appointed incumbent shall continue in office "until his successor is appointed and qualified." We have no general provision of that kind, constitutional or statutory, applicable to offices in this State. In the second place, there could as the majority holds, be no special election ordered to fill the office, because the act of February 18, 1891, which it is claimed repeals section 130 of the Code, expressly declares that the election of Commissioner of Agriculture shall be held "at the general election in 1892, and every two years thereafter." This is the latest expression of the legislative will, and we think necessarily implies that there can be no election till that time.

A third consequence of declaring that section 130 of the Code was instantly repealed by the approval of the act of February 18, 1891, and of the contention of appellee that he rightfully holds over under his appointment of September 1, 1889, until his successor is elected and qualified in August 1892, would be to declare not only that a repealed statute secured to him this privilege, but that it secured it to him without an official bond of binding obligation. We say, without a binding official bond, because we approve and will adhere to the doctrine declared in *City Council of Montgomery v. Hughes*, 65 Ala. 201. We there said, in effect, that the purpose of such clause is to guard against a possible hiatus or interregnum between the termination of one incumbent's term and the qualification of his successor. This was and is intended to secure continued service in the office, and lasts for only a reasonable time. It was not intended to extend the liability of bondsmen to a term for which they had not contracted to be bound, even though the legislature expressly sanctioned such extension. To enlarge the binding effect of a contract previously entered into, is not alone without the scope of legislative power as to the sureties. It is void as to the principal himself if done without his

[Lane v. Kolb.]

authority, express or implied.—*U. S. v. Kirkpatrick*, 9 Wheaton 720; *Bigelow v. Bridge*, 8 Mass. 275; *Dover v. Twombly*, 42 N. H. 59.

There are decisions not consistent with some of the principles declared in *City Council v. Hughes, supra. Com. v. Hanley*, 9 Penn. St. 513; *State v. Lusk*, 58 Mo. 333; *People v. McIver*, 68 No. Car. 467; *State v. Howe*, 25 Ohio St. 588; 18 Amer. Rep. 321; *People v. Tilton*, 37 Cal. 614. None of these authorities hold that the liabilities of bondsmen can be increased by legislative enlargement of the official term. We think that, on the main point, the case of *City Council v. Hughes* rests on impregnable grounds, and we will follow it.

"'We have copied the act approved February 18, 1891, in full. It is not in form an amendment of section 130 of the Code. It, in terms, repeals " all laws and parts of laws in conflict with " its provisions. We take it that all will admit this clause accomplishes nothing. The same result would follow if it had been omitted. It repeals, and only repeals laws or parts of laws in conflict with it, and a late legislative enactment always does that. Enactments that are in conflict, or inconsistent with each other, can not both be the law at one and the same time. The later enactment, being the latest expression of the legislative will, is the law; and declaring a rule of action different from that previously prescribed, necessarily displaces and repeals older laws. But, whether expressed, as in the statute we are construing, or implied *ex necessitate rei*, the repeal is only co-extensive with the conflict, or imcompatibility.

The caption of the act of February 18, 1891, is in the following language : "To make the office of Commissioner of Agriculture elective." It contains but one subject, which is clearly expressed in the title. Cons. of Ala., Art. IV, §2. All the affirmative provisions of the statute are strictly in line with the caption. It declares that the office of Commissioner of Agriculture is hereby made elective, "and at the general election in 1892, and every two years thereafter, there shall be elected one Commissioner of Agriculture, whose term of office'shall be two years." The legislature had but one controlling purpose—to change the mode of selecting the incumbent of the office. That thought was dominant in their minds, and they gave expression to it. But as no general election would be held under our constitution until 1892, no State election could be held to fill the office until 1892, unless the legislature chose to order a special election for the purpose, and they made no such

[Lane v. Kolb.]

order. On the contrary, they precluded, as we have seen, all possible claim that the office should be filled by special election, by declaring when it should take place—"at the general election in 1892." By the very terms of the enactment, nothing was to be done under it, until the general election in 1892. Eleven months before that time the statutory term of the incumbent then in office would expire. For this term of eleven months the legislature made no provision. They could have provided for a special election, had they chosen to do so, or, they could have made express provision for filling that term. They did neither.

The whole of section 1 of the act being one continuous sentence. containing only commas in its punctuation, and the first half of the sentence making the office elective being connected by the conjunction "and" with the latter part which fixes the time for holding the election, it can not be inferred or supposed that it was intended that the first part should go into immediate effect, and the last suspended until seventeen months afterwards. We know of no rule of interpretation, either of law or grammar, by which one continuous sentence, relating to one single subject, joined together in all its parts by the copulative conjunction, can be so severed as to make one operative presently, and the other postponed, in the absence of express direction to that effect. The principle of interpretation which requires us to give some operation to every clause of a statute, if we can, finds no practical field of operation in the statute we are construing. There is but one sentence, and what is termed a second clause, is only the concluding member of the sentence. The first member makes the office elective, and the second declares when the election shall be held. Beyond this, the statute is silent. The legislature knew there would be a vacancy at the end of the then incumbent's term. If the intention was to put the statute into immediate practical operation, why did they not make some provision for filling the vacancy they knew would occur? They expressly ordered an election for 1892. Why were they silent as to an election in 1891? Should we not presume that this was intentional? A specific provision in a statute controls a general provision. *Felt v. Felt*, 19 Wis. 193; Endlich on Int. of Statutes, § 399. Why should not the specific provision, ordering an election in 1892, control the general legal intendment, that statutes take effect from the date of their enactment, unless otherwise directed? Is not the conclusion strong that it was intended to be otherwise directed in this case?

The inquiry is raised, whether the act of February 18, 1891, would not have the same operative effect which the majority of the court gives to it, if what is claimed as the first clause had been omitted. Omitting those words, the statute would read as follows : "Be it enacted," &c., "that at the general election in 1892, and every two years thereafter, there shall be elected one Commissioner of Agriculture, whose term of office shall be two years."

To this we answer,

First, such language in a statute would be very unusual, and on its face would bear the semblance of incompleteness. We can not suppose the legislature would enact a solemn statute in such unusual terms. Second, if the enactment had been in that form, it would have been difficult, if not impossible to determine whether or not the intention was to create an additional Commissioner of Agriculture, or to convert the former office into an elective one. What is called by our dissenting brothers the first clause, is the only part of the statute which shows that it refers to the office then and theretofore known as the Agricultural Commission. Its language is " that the office of Commissioner of Agriculture be hereby declared an elective office." The definite article, *the*, individualizes the subject, and shows the legislature referred and intended to refer to the officer then known as the Commissioner of Agriculture. The word "hereby" imparts no additional meaning to the statute. It means by this act, or by this statute; nothing more. The statute would receive, and necessarily receive the same interpretation—accomplish the same result—without it, as it does, or can do with it. Suppose, instead of the language employed, the legislature had said, Be it enacted that the Commissioner of Agriculture, whose office is by this act made elective, shall be elected at the general election in 1892, and every two years thereafter, &c. Could a different interpretation be put on the language supposed from that properly applied to the statute as it is? And would any one contend that the words, " by this act ", had the effect of putting any part of the statute in practical operation, before the time fixed for doing the first practical act under it? We apprehend there could be but one negative answer to these questions.

Let us further suppose that until the enactment of the statute approved February 18, 1891, there had been in this State no such office as that of Commissioner of Agriculture, but the duties of the office, as now prescribed by law, had either not been formulated and assigned, or had been vested

in some other department of the State government. Would any one contend that the statute, framed as it now appears, would go into practical operation in any of its provisions, until the time arrived which itself had fixed for holding the election to fill the office? Would any one claim that a special election could be called to fill a supposed vacancy —the non-incumbency of the office—until the general election in 1892? Would not the rules of interpretation demand in such case that we hold that the legislature intended things should remain *in statu quo*, until the time they themselves had prescribed for filling the office? Is there a reasonable ground of difference in principle between the supposed case and the case we have in hand?

To hold a special election for a State office would cost the State a large sum. The legislature knew this. They must not be presumed to have intended any thing detrimental to the State, or tending to its great inconvenience, unless by their express command they leave us no latitude of interpretation. Is the statute before us of that class? It mentions only one date—the time for holding the general election in 1892. It is silent on the question of filling the office until that time. We must suppose the legislative mind took in the situation, and that it was manifest that the statute being enacted would create a vacancy at the expiration of the incumbent's term, or that he would hold over eleven months, until his successor was elected and qualified. We can not indulge the presumption that the functions of this important office were intended to be left dormant and without an incumbent for eleven months. They, then, must have expected and intended, either that the Commissioner in office should hold over, or that the statute theretofore in force which made the office appointive, should remain in operation until August 1892, or that the intervening term of eleven months should be filled by special election. They could not have intended a special election, for reasons which we think we have shown. The provisions of the statute repel that interpretation. *Expressum facit cessare tacitum.* Can we presume that because they made no such provision, they intended, at once, to so far repeal section 130 of the Code as to take away the Governor's power of appointment, yet leave it in force and unrepealed to the extent that the incumbent shall continue in office, without bond, until his successor is elected at the general election in 1892, and qualifies pursuant thereto? Does the language of the statute show that the legislature intended this? Does not the language of the statute force the conclusion that the intention

was to put the statute in practical operation at the time the
first act was to be done under it—the holding of the election
in August 1892, and not till then? The legislature did not
in terms declare that the incumbent should hold over after
the expiration of his term ; did not in terms take away the
Governor's appointing power. If these results were brought
about, it was accomplished by legal intendment, and not by
direct command. The intendment invoked is, that statutes
take effect at the date of their enactment, unless otherwise
expressed. We think it is otherwise expressed in this case,
for the first and only act expressly directed to be done under
it, is postponed to August 1892.

We have attempted to show that the interpretation con-
tended for would lead to results at once unreasonable, and,
in theory, at least, opposed to the public welfare. The oppo-
site view gives the legislature credit for an intention to in-
flict no inconvenience or hardship, but to conserve the pub-
lic interest. We have thus the alternative presented to us
of following an asserted legal intendment, not expressed in
words, which tends to public inconvenience and detriment,
or, of declaring that the legislature intended the best con-
servation of the public interests, and expressed that inten-
tion by postponing action under the law until August 1892.

We have contended that the express direction to elect the
Commissioner of Agriculture at the general election in 1892,
is an implied inhibition of the right to elect before that
time. Our dissenting brothers claim that the effect of this
argument, if carried to its logical results, will be to deny all
right to fill that office by special election for all time. This,
because the statute, after directing the election to be held in
1892, adds the words, " and every two years thereafter." This
we conceive to be an entire misapprehension. There was,
until this enactment, no general law declaring this to be one
of the elective State offices. The command of the statute
we are considering is, that the Commissioner shall be elected
" at the general election in 1892." If the statute had
stopped there, there could have been no subsequent election
to the office, because no provision would have been made for
it. And a serious question might have arisen, as to the
length of the term of the office. The super-added direction
to elect every two years thereafter, was necessary to place
this office in line with the bulk of the State executive offi-
ces, filled by popular vote. That was its purpose, that the
extent of the direction. Being made elective and the elec-
tions ordered every two years, and at the same times as the
elections of other State officers take place, the consequence

[Lane v. Kolb.]

is that it falls in line with other State offices filled by popular vote, except in the respects that the statute makes a difference. The statute makes no provision for filling vacancies by executive appointment, and the consequence is, that after the incumbency of the office is supplied by election at the general election in 1892, vacancies supervening would have to be filled by special election. This is the full scope of the provision, and, we think, a full answer to the argument of our brothers based upon it.

Certain decisions of other courts are relied on in support of the proposition, that section 130 of the Code was immediately repealed by the approval of the act of February 18, 1891. The strongest cases cited are those from Illinois. In that State there is a constitutional provision that "no public act of the General Assembly shall take effect, or be in force, until the expiration of sixty days from the end of the session at which the same may be passed unless, in case of emergency, the General Assembly shall otherwise direct." The first case which seems to have arisen under this provision is *Wheeler v. Chubbuck*, 16 Ill. 361. In that case, as we gather from the opinion, the contention was that part of a statute, less than the whole, became operative before the expiration of the sixty days, by force of a certain expression found in the act. This contention did not succeed. As we understand the ruling of the court, it is rested on two grounds, viz: First, the uniform practice of the Illinois legislature, whenever it was intended to fix a different time from that named in the Constitution for the statute to take effect, to express that intention directly in the statute itself. Second, that this intention, to be effective, must embrace the whole statute, and not a part of it. The principle involved arising, as it did, out of a constitutional provision—a law which the legislature could not change—this, it would seem, should rightfully have exerted some influence. Speaking of the practice of the Illinois legislature, the court said: "Wherever it is designed that a law shall go into force before the expiration of the sixty days, we universally find a separate clause at the end of the act, of the following purport: 'This act to take effect and be of force from and after its passage.' I find one hundred and twenty-seven acts, passed at the same session of the legislature, terminating with substantially the same distinct and unequivocal clause. There is one, declaring by a separate and distinct clause, also at the end of the act, that it should take effect on the first day of August. There are two in which it is declared, in a similar way, that they should take effect on the first day of April;

and two others in which it is also declared. in a similar way, that they should take effect on the first day of March, the very day on which it is insisted that this act took effect. This, at least, serves to show what is the universal practice of the legislature, when they deem an act of sufficient emergency to take it out of the constitutional provision. In the law in question there is no distinct clause, declaring when the act, as a whole, should take effect, and become an operative law. It is true that the act says, that after the first day of March, next, certain acts should not be done. but whether the word *next* refers to a time succeeding the final passage of the bill, or the approval by the Governor, or the time fixed by the Constitution for the law to take effect, the legislature did not say. In order to take an act out of the constitutional provision, the legislature must direct that the act as a whole and entirety, shall take effect at a different time; and it is not sufficient, that certain parts of it might bear a construction which would, taken separately, give those parts effect at an earlier period."

The later case of *The Board of Supervisors v. Keady*, 34 Ill. 293, is rested on the authority of the older case of *Wheeler v. Chubbuck*, and is not distinguishable from it in the principles it declares. We think each of these decisions is eminently sound, when applied to the constitutional principle involved and the facts of the cases before the court. And the cases cited from Missouri and New York we fully approve. None of them, as we understand them, are opposed to the principles herein above declared.

The constitution of Massachusetts contains the following clause: "Each branch of the legislature, as well as the governor and council, shall have authority to require the opinions of the justices of the supreme judicial court, upon any important questions of law, and upon solemn occasions."

The legislatures of the years 1854 and 1855 proposed amendments of their constitution, which were voted on and adopted in May, 1855. Proclamation was duly made of their adoption, and they thereby became parts of the Constitution of Massachusetts. Those amendments made a radical change in the mode of electing certain State officers, yet, under its provisions, it was not possible to elect those officers, to serve during the year 1856. No provision had been made to meet the emergency, and if the election could not be held under the then displaced clauses of the old constitution, those offices must remain vacant for the year 1856. The governor and council propounded. inquiries to the justices of the supreme judicial court, to obtain their opinions

as to the power and duty of the executive authority in the premises. That confessedly able bench was, probably, as ably filled at that time, as at any period of its history. The distinguished Lemuel Shaw was then chief justice, and among the five associates were the little, if any less, distinguished Theron Metcalfe and Plinny Merrick. The opinion rendered was concurred in and signed by all the justices, six in number. Among other things they said: "In answer to the first question, we are of the opinion, that the third article of these amendments will have no effect whatever upon the tenure of the office of the present members of the executive council. Even if no legislative action were necessary, there could be no election of councillors, until the Tuesday next after the first Monday of November, 1855, and the councillors then chosen can not enter upon the duties of their offices until the first Wednesday of January, 1856, at which time, or as soon thereafter as others are chosen and qualified in their place, the offices of the present council will cease. ' The present amendment contains no express repeal of pre-existing provisions of the Constitution; it repeals them by necessary implication, by providing another and different mode of filling these offices, but it can not have that effect until it comes practically into operation. . . . . . . In regard to the second part of the first question, our opinion is this. Supposing the first regular session of the legislature to be held in January next, there can be no division of the Commonwealth into districts, until a law is passed for that purpose in the course of that session, and of course there can be no election, until November, 1856, for councillors for the year 1857. In that case, we are of the opinion, that councillors for the year 1856 may be rightfully and properly chosen, by the two houses of the legislature, in the manner required by the provisions of the constitution in force at the time when the amendments were adopted. . . . . . . As, therefore, the amendment supersedes and annuls the old provisions of the constitution, by its practical working, in filling these offices in another mode, it follows that it will have that effect when only, in the course of its own regular operation, that result has been accomplished. If, then, in the regular operation of this amendment the legislature, in 1856, being the first session after the adoption of it, shall pass a law dividing the State into districts for the election of councillors, and the opportunity for making such election will be in November, 1856, we are of the opinion, that the former provisions of the Constitution for the choice of councillors will remain in

[Lane v. Kolb.]

force, so that it will be competent for the two houses of the
legislature, at the organization of the government for the
year 1856, to elect councillors, and during that year to fill
vacancies, in the same manner and with the like effect as if
this amendment had not been made. . . . . . . . . .
The fourth article provides for the election of the secretary,
treasurer, auditor and attorney-general.  The time for giving
in of the votes for these officers, the mode of declaring, cer-
tifying and returning the votes, are all definitely provided
for by the article itself, so that no legislation is necessary to
give it effect.  The first election, however, which can be
made, under this provision, will be made on the Tuesday
next after the first Monday of November next, and the
officers then chosen are to hold their offices for one year
commencing on the third Wednesday of January next there-
after.  But as this amendment of the constitution, and the
elections made under it can not so operate as to fill these
offices, until the third Wednesday of January next, we are of
the opinion, that, up to that day, appointments to these
offices are to be made, removals effected, and vacancies
filled, in the same manner as if this amendment of the con-
stitution had not been made."

The following question was also asked :  " Terms of office
at present appointed, but by said articles made elective, ex-
piring, can new appointments be made by Governor and
council, and for what term shall said officer be appointed ? "
and was answered as follows :  " In case the terms of office
of any of the said officers, who hold the same by appoint-
ment of the Governor and council, shall expire before the
said offices shall be filled by election pursuant to said arti-
cles of amendment, and the laws made pursuant thereto,
we are of the opinion, that new appointments can be made
by the Governor and council, and for such terms respect-
ively as they would have been appointed for under the con-
stitution and laws as they existed when said amendment
was adopted, subject only to be sooner determined by the
election and qualification of other persons to the same
offices, conformably to these articles of amendment, and the
laws made pursuant thereto."—*People v. Wilson*, 72 Nor.
Car. 155; *Plumstead Board of Works v. Spackman*, Law
Rep. 14 Q. D. 878.

It was contended in argument before us, that when the
act to make the office of Commissioner of Agriculture elec-
tive was pending before the legislature, an amendment was
offered, providing that the incumbent then in office should
continue in office until his successor was elected at the gen-

[Lane v. Kolb.]

eral election in 1892 ; and that that amendment was defeat-
ed.    The journals of the two houses have been produced be-
fore us, and show that the bill was first introduced in the
Senate and passed that body, substantially as it became a.
law.    It was amended in the House of Representatives, by
the addition of the clause, that the Commissioner then in,
office should hold the office until his successor was elected
and qualified.    The senate refused to concur in the amend-
ment, and the bill finally became a law without the amend-
ment.    It is contended for appellant that this may be look-
ed to in determining the legislative intent.    In the Legal
Tender cases, 12 Wall. 457, this question was considered,.
and the ruling appears to have been that it was not enti-
tled to any weight in interpretation.    The question in that
case arose on a constitutional provision.

While we do not consider it a legitimate subject of in-
quiry in the case we have in hand, it is gratifying to know
that in arriving at our conclusions, we do not run counter
to what appears to have been the intention of the legisla-
ture.

There is no disagreement among the members of the court
on the proposition that the office of Commissioner of Agri-
culture was vacant on or from September 1, 1891.    We differ
as to the manner of filling the vacancy.    The majority of the
court hold that in the appointment and qualification of H.
D. Lane the statutes then of force were conformed to.    It
follows, that, in our opinion, the petitioner was and is enti-
tled to the office, with all that pertains to it ; and we, there-
fore, reverse the judgment of the Probate Court.

The decision in the court below was pronounced on the
pleadings.    We can not certainly know that no issue of fact
can or will arise in the future progress of the case.    We
therefore remand the cause for further proceedings in the
Probate Court.

CLOPTON and WALKER, J. J., concurring.

Dissenting opinion of Justices McCLELLAN and COLEMAN:.

The facts and *status* of the case are sufficiently stated in
the opinion of the court rendered by the Chief Justice.

Section 130 of the Code reads as follows :

" *Appointment of Commissioner and term of office.*—The
Commissioner of Agriculture is appointed by the Governor,
and holds office for the term of two years, and until his suc-
cessor is appointed and qualified."

The act of February 18, 1891, is as follows :   "An act to

make the office of Commissioner of Agriculture elective." "Section 1. Be it enacted by the General Assembly of Alabama, that the office of Commissioner of Agriculture be hereby declared an elective office, and that at the general election in 1892, and every two years thereafter, there shall be elected one Commissioner of Agriculture, whose term of office shall be two years. Section 2. Be it further enacted, that all laws and parts of laws in conflict with the provisions of this act be, and the same are hereby repealed."

There is nothing in the latter act which expressly or impliedly extends the term of office fixed by section 130 of the Code. In the case of *City Council of Montgomery v. Hughes*, 65 Ala. 206, the words, "and until his successor is appointed and qualified," employed in section 130, *supra*, were judicially construed and declared. It is there held, that the clause "was intended to cover the reasonable time which may be necessary for his successor to qualify." This decision was rendered many years prior to, and was in force at, the time of the passage of section 130 of the Code, in which the same words are used. It is the law, that the substantial reenactment of a statute, which has received a known, fixed judicial construction, is a legislative adoption of that construction.—3 Brick. Dig., p. 749, § 16, and many authorities cited to support the text. The same rule must apply to the use of words which have been judicially declared. Whatever construction may have been given to these words in other States, it is not an open question here. We are bound to presume the legislature re-enacted them as judicially construed.

The term of an incumbent holding by appointment under section 130 of the Code was limited to two years from the day of his appointment, and a reasonable time thereafter, for the appointment and qualification of his successor. Whether the term of the incumbent continued until the expiration of the two years to which he was appointed, or was immediately terminated by the act of February 18, 1891, is the difficult question in this case.

The act can not operate prospectively so as not to interfere with the term of the then incumbent, and operate immediately, so as to take away at once the appointing power of the Governor. In our opinion, there is no escape from this conclusion, if the act is fairly and impartially construed, giving to all its parts some force. If the operation of the act was immediate, so as to make the office at once elective, it took from the Governor the power to appoint, and at the same time, it terminated the term of the then incumbent,

and, created a vacancy in the office.    We will test the act
by well known rules of construction.

All courts and text writers of recognized authority, so far
as we have examined, hold that when a statute is expressed
in ambiguous terms or words, or so framed that it is of
doubtful meaning, in arriving at the legislative intent, it is
proper to consider the result intended, and consequences to
follow its construction; and any construction of a statute of
this character, which will defeat its operation, or lead to an
absurd conclusion, or injuriously affect the public welfare,
as far as possible ought to be avoided.    The same authori-
ties, with equal unanimity, recognize that this rule of con-
struction does not apply, and is wholly inadmissible, when
the statute is free from ambiguity, when the legislative
intent is clearly expressed, and the statute can have but one
meaning and purpose.    Otherwise, under the rule, courts,
instead of construing the law, will exercise a supervisory
and controlling power over the policy of legislation.

The opinion of the Chief Justice, to our minds, proceeds
on the assumption, that the consequences to flow from an
act are always to be looked to in arriving at its meaning.
That this can not be done where the language of the act is
plain and unambiguous, is amply demonstrated by each of
the cases cited and relied on by the Chief Justice.    Thus in
*Somerset v. Dighton*, 12 Mass. 383, it was doubtful on the
words of the act, whether it was intended to operate retro-
spectively, and the court held, on the familiar rule, that
statutes are not to be taken as operating in the past, unless
the intention to have them do so is manifested by the most
clear and unequivocal expressions; that, it being doubtful
whether such intent existed, there being no clear expression
of it, the statute operated prospectively only, to avoid re-
sults which would flow from the contrary construction,
never questioning, however, that had such intent been
clearly expressed, the consequences of executing it could not
be looked to.    So with the case of *Smith v. People*, 47 N. Y.
330.    The opinion there proceeds expressly on the ground
that the *language* of the act and of another act *in pari
materia* exhibited, in some degree, a legislative intent to
limit the effect of an otherwise broad provision, "sufficient
to create a reasonable doubt as to the true meaning of the
act, and justify the looking outside of the act for other legi-
timate evidence of the intent."    The case of *Stewart v.
Keemle*, 4 Serg. & R. 72, involved an act confessedly ob-
scure in its own terms.    And in *Hoke v. Henderson*, 4 Dev.
L. (N. C.). referred to particularly by the Chief Justice, the
        32

learned Ruffin held that, "In construing a statute, if the words are ambiguous, resort should be had to the probable consequences, which would arise from the one or the other construction; but, if the meaning of the language of the act be plain, there can be no such resort." And he continued: "We can not, under the pretense of interpretation, repeal the act, and thus usurp a power never confided to us, which we can not usefully exercise, and which we do not desire." Also, in *Neenan v. Smith*, 50 Mo. 525, it is expressly held, that the doctrine that a resort to the absurdities or inconvenience to flow from an act may be had in construing it, does not apply, unless the statutory terms are, in themselves, doubtful, obscure and ambiguous. And in the case of *The People v. Wilson*, 72 N. C. 155, the court start out with the declaration that the words of the statute to be construed, "taken by themselves, are too indefinite to have any particular meaning."

It is quite true, that in the case of *Board of Works &c. v. Spackman*, L. R. 13 Q B. 758, relied on by the Chief Justice, Brett, Master of the Rolls, held that the consequences might be looked to in construing a statute which is plain and unambiguous, since, as he argued, the legislature could not be said to have meant what it had clearly expressed, and he proposed to give a meaning to the act in consonance with his views as to what the law should have provided; but his associates on the Queen's Bench, Bowen and Fry, constituting a majority of the court, repudiated this doctrine *in toto*, held precisely the contrary, and judgment went accordingly.

It would seem that no better or additional authorities, than those relied on and quoted from by the Chief Justice, are needed to put our position in this regard beyond the pale of controversy; but we cite, without further comment, the following, each one of which is directly in point to the proposition, that when the terms of an act are plain and unambiguous, they must be so expounded and executed, wholly regardless of the court's views as to the inconveniences, or even absurdities, to result from giving effect to the statute according to its terms.—Sutherland on Stat. Cons., § ; *Abbey v. Dale*, 73 E. C. L. Rep. 390; *Douglass v. Freeholders*, 38 N. J. L. 214; *Rex v. Commissioners, &c.*, 6 A. & E. 7; *Clark v. R. R. Co.*, 81 Me. 477; *Dudley v. Reynolds*, 1 Kan. 289; *Bartlett v. Morris*, 9 Port. 268; *Maxwell v. State*, 89 Ala. 150.

It would be an unsafe innovation, beyond judicial discretion, to use a rule of law, intended as an aid to interpret

laws of confused or doubtful meaning, to beget a doubt in the statute by reference to extraneous matters, and then use this illegitimate product of the rule to defeat or thwart the clearly expressed intention of the statute.

Let us apply these ascertained and universally recognized principles to the statute under consideration. The act provides that "The office of Commissioner of Agriculture be hereby declared elective." It would be difficult to express the legislative intent in clearer and more unmistakable language. These words admit of but one construction, and that is, the office of Commissioner of Agriculture is thereby declared elective. The act further proceeds, "and that at the general election in 1892, and every two years thereafter, there shall be elected one Commissioner of Agriculture, whose term of office shall be two years." We have examined the language as a whole, and the words used separately, and have been unable to discover, in either view, anything suggestive of a doubt or ambiguity. It does not occur to us, that the office of Agricultural Commissioner could be declared elective, and provision made for his election at the general election in 1892, in more simple, unambiguous and intelligible language. We take it, that there can be no doubt or confusion as to the meaning and purpose of the act.

Is there any doubt as to the time when the act shall go into operation? We will test this contention also in the light of settled rules of construction, based upon sound principles of law as declared, not only by the decisions of this court, but those of the Supreme Court of other States.

In Illinois the constitution provides that "no public act of the General Assembly shall take effect, or be in force, until the expiration of sixty days from the end of the session at which the same may be passed, unless, in case of emergency, the General Assembly shall otherwise direct." On the 27th day of January, 1853, the legislature of that State passed an act providing "that from and after the first day of March next, it shall not be lawful," &c., to allow sheep and swine to run at large in certain named counties. The "first day of March next," after the passage of this act—the legislature having adjourned meantime—was within the sixty days which the constitution required to elapse before the acts of that session went into operation, unless the General Assembly should otherwise direct. It would seem, at first glance, that this act did contain such direction, in that it, in terms, made acts done within that time unlawful. But the Supreme Court of Illinois held otherwise, in the following language:

"The object of this provision of the constitution no doubt was, to enable those who are to be governed or affected by a law, to become informed of its provisions, while at the same time, in cases of emergencies, a discretion is vested in the legislature to dispense with this provision of the constitution, and direct that the law shall sooner go into operation. It may not be denied that this discretion can not be revised by the court, and that the General Assembly is the sole judge of the emergency, which shall induce them to anticipate the constitutional period when a law shall go into operation. *But such direction must be made in a clear, distinct and unequivocal provision, and can not be helped out by any sort of intendment or implication.* . . . . . In order to take an act out of the constitutional provision, the legislature must direct that the act, as a whole and entirely, shall take effect at a different time; and it is not sufficient, that certain parts of it, taken separately, give those parts effect at an earlier (or, I may add, a later) period. The legislature did not direct that this act should become an operative law before the time fixed by the constitutional provision"— *Wheeler v. Chubbuck*, 16 Ill. 361. And to the same effect is the case of *The Board of Supervisors &c. v. Keady*, 34 Ill. 293. So, in Missouri, where the general rule is, that acts shall go into effect ninety days after their passage, unless a different time is fixed by the particular act, a provision that "subsequent to the passage of this act," the law should be as therein declared, was held insufficient, though manifestly affording a strong inference thereto, to bring the act into operation before the lapse of ninety days. *Andrews v. St. Louis Tunnel Co.*, 16 Mo. App. 299. In New York, it is provided by statute that "every law, unless a different time shall be prescribed therein, shall commence and take effect throughout the State on and not before the twentieth day after the day of its passage, as certified by the Secretary of State." A statute was passed which, in its first clause provided that, "After the passage of this act all property which shall pass by will," &c., &c. The act was passed on June 10th, 1885, and the question was whether it took effect from its passage, or on the twentieth day thereafter, as provided by the general statute above adverted to. The court, holding that the language of the act was not sufficiently explicit to amount to a prescription of a different time than that fixed by the general law, said : "Experience has shown that it is of the highest importance to every interest that the precise time when a statute takes effect shall not be left in doubt. To effect this important

purpose, the twelfth section was enacted, and it should control all subsequent statutes, which do not prescribe in precise terms the exact time when they shall take effect. So important is certainty in this respect that, when it has been established by usage, by a constitution, or by a general law, that statutes shall take effect at a specified time, unless otherwise prescribed in the statutes, that courts will not presume an intent to change the general rule, unless the legislative intent is expressed in unambiguous language." *In the matter of Howe*, 55 N. Y. S. C. 235, (citing the authorities referred to above, and the following: *Rice v. Ruddiman*, 10 Mich. 125; *Harding v. People*, 15 Pac. Rep. 727; *Lutless v. Holmes*, 4 T. W. 660; Bishop Stat. Cr., § 31). And this case was affirmed by the court of appeals of New York.—112 N. Y. 100.

In his attempt to meet and parry the overwhelming reasoning and force of these authorities, the Chief Justice laid great stress upon the fact "that the principle involved arose out of a constitutional provision, a law which the legislature could not change." The Chief Justice gave no reason, nor cited any authority why a constitutional provision should be more binding or construed differently in this respect, than an act of the legislature, and we think none exist. Furthermore, the Chief Justice, speaking for the majority, fully concurs with the opinions delivered and conclusions reached in the cases of *Andrews v. St. Louis Tunnel Co.*, 16 Mo. App. 229, and *In re Howe*, 55 N. Y. S. C. 235, (s. c. 112 N. Y. 100), upon which we rely. He says: "And the cases cited from Missouri and New York we fully approve." Now, in those cases, no constitutional provision was involved. On the contrary, the rule fixing the time for statutes to take effect in each of those States is declared by a general statute, as in Illinois it is declared by the Constitution, and as in Alabama it is declared by the decisions of this court, handed down in the first years of our Statehood, and always since adhered to and acted on; and in the New York case, which the Chief Justice "fully approves," it is expressly declared that whether the rule arises "from a usage, a Constitution, or a general statute," statutes will become operative at the time fixed by it, unless a different time is clearly expressed in the particular statute, and that the legislative intent to fix a different time can not be inferred or arrived at *arguendo* from the mere fact that some provisions of the act take effect at a time other than that prescribed by the general rule. The rule is essentially the same in Alabama. In the case of the *State v. Click*, 2 Ala. 26, it was held that a penal

statute took effect from the day of its passage, notwithstanding it contained a requirement that the Secretary of State shall cause this act to be published for three months in the papers of "several named cities. The Court, by Collier, C. J., said : "In the case of the *Administrators of Weatherford v. Weatherford*, (8 Port. 174), the Court said : "A statute, according to the settled rule in the courts ·of the United States of the Union, where no time is fixed for the commencement of its operation, takes effect from its passage. This rule may sometimes operate harshly ; yet it is now too firmly settled to be changed in any mode than by legislation."—*Br. Bank of Mobile v. Murphy*, 8 Ala. 119 ; *Taylor v. State*, 31 Ala. 383.

It can not be contended that the statute under consideration itself fixes a time expressly when it is to take effect. The language used is such as we would expect to find, and such as is generally employed, when the intention of the legislature is to make it effective from and after its passage. It is the opposite of that used, and which we would expect to find, in an act intended to become operative only *in futuro.*

Concede for the argument, that the first clause of Section 1, "That the office of Commissioner of Agriculture be hereby declared an elective office" if standing alone, would give the act immediate operation, and that the latter clause, to-wit, "and that at the general election in 1892, and every two years thereafter, there shall be elected one Commissioner of Agriculture," if alone, would show that the intention was to defer its operation until the time of the general election in 1892. We would then have two clauses in the same section seemingly at war with each other, as to the time when the act was to take effect. The rule of construction in such cases is clearly ascertained and declared. A statute must be so construed, if possible, as to give some effect to every clause, and not to place one portion in antagonism to another. A construction, which leaves to a sentence or clause of a statute no field of operation, should be avoided, if any other reasonable construction of the language can be given.—*Lehman v. Robinson*, 59 Ala. 219, and authorities cited ; *Ex parte Dunlap*, 71 Ala. 73.

To hold that the latter clause of the act has the effect to defer the operation of every part of the act until the election in 1892 simply annuls the first clause and leaves it no field of operation.

Is not the true and better rule that declared in the Illinois, Missouri and New York cases, *supra*, where it is held, that

although a part of an act may be so framed as to become
operative at a time not fixed by the general law, yet if
other parts take effect under the general law at a different
time, that part of the act which militates against the gen-
eral law must yield?   There can be no question that if the
act of February 18, 1891, had simply enacted as follows :
"Be it enacted by the General Assembly that a Commis-
sioner of Agriculture be elected at the general election in
1892, and every two years thereafter," without more, the
effect would have been to repeal by implication section 130
of the Code, making the office appointive, as effectively as
the act with its present provisions.   If this had been the
full text of the Act of February 18, 1891, we are not pre-
pared to say that it would go into operation before the time
fixed for the general election.   The advisory opinion of the
learned justices of the Supreme Court of Massachusetts so
largely quoted from by the Chief Justice, "hath this extent,
no more:"   They were simply construing an article of the
Constitution which declared that an election should be held,
at a day named in the future, for the election of certain
officers.   The fact that the Constitution was to take effect
from and after the proclamation of the Governor can exert
no influence in its construction.   This simply had the effect
to make it law from and after that time, just as the approval
of an act by the Governor.   By the proclamation, in one
case, and the approval of the Governor, in the other, the
provision became law effective for the purpose intended,
but whether intended to become practically operative *eo
instanti*, or in the future, depended upon the statute or law
itself, and not upon a proclamation or approval.

The constitutional amendment providing for the election
of eight executive councillors contained in itself a provision
that the legislature should re-district the State into eight
council districts, before any election could be held to fill the
office of councillors, and under the law, the regular session
of the legislature, authorized to perform this duty, could not
meet until the following January.   The amendment further
provided that five of these councilmen, with the Governor,
should count the votes to see who were elected as council-
lors under the new law.   It will thus be seen that the act
itself continued in the office of councilmen the then incum-
bents.   So, in regard to the election of sheriffs, &c.   The
article provided for legislative action, before an election
could be held to fill these offices.   The fourth article, which
provided for the election of Secretary, Auditor, &c., required
no further legislation, and in this respect its provisions are

similar to the act under consideration. Now, observe the reason assigned by these learned justices, why the incumbents held on, and the power to fill vacancies by appointment continued in the Governor, until filled by an election held under the amended constitution. Their opinion rests solely upon the ground that "the present amendment, contained no express repeal of pre-existing provisions of the constitution; it repeals them by necessary implication by providing another and different mode of filling these offices, but it can not have that effect until it comes practically into operation." The opinion, on pages 603 and 604, concedes that if there had been any provisions in the constitutional amendments, annulling, revoking or repealing the provisions of the Constitution to be amended, the result would be different. It proceeds entirely upon the ground that the repeal was effected by the practical working of the amendment, and not by any provision contained in the amendment, and therefore it did not supersede or annul that which existed until the practical working began. This is precisely our contention. The act of February 18, 1891, contained a clause providing for an election in 1892, which by its practical working would have superseded and annulled section 130 of the Code, but the act has a further provision in it which, *ex vi termini*, repeals section 130, independent of the practical working of the act under the general election clause. It becomes necessary to wipe out the first clause of section one of the act of February 18, 1891, before the advisory opinion of the learned justices can apply. So long as the first clause remains a material constituent of the act, the advisory opinion is an authority in our favor. (It is direct to the proposition stated by us, that the effect of the latter clause of the act of 1891, without more, repeals by implication section 130 of the Code.)

The opinion of the court in this rests upon an untenable foundation. It labors to show that the first clause has no effective force or meaning. It refers to the conjunction " and " as connecting the first part of the act which declares the office to be elective, with the latter part, which fixes the time for holding the election, and summarily disposes of it by the statement, that no rule of law or grammar would authorize the construction that one part was to operate presently, and the other to be postponed. We assent to the conclusion, and as the whole act is to go into operation at the same time, the question, whether the first part which is to take effect at once, under the general rule, or the latter part, which becomes operative later, and effects

[Lane v. Kolb.]

a repeal only by implication and by its working, shall govern the whole act. The Illinois, Missouri, New York and Alabama decisions, and opinion of the Justices of Massachusetts settle this question. The conjunction "and" will not down at such a "bidding," and ought not, in our opinion, to be so unceremoniously shoved aside. "And" does not mean "or," or imply that which precedes is the same as that which follows. "And" signifies an addition, that something is to follow in addition to that which precedes. It is entitled to this consideration in the statute under consideration, whether section one be considered as composed of two clauses, or of one clause, containing two provisions referring to different matters, with conflicting intendments as to the time the act was to take effect. The same rule for its construction applies in either view. The argument is quite strained, which seeks to apply any other rule, either grammatical or legal to its construction. There is no rule of law, we confidently assert, which authorizes an entire disregard of any portion of the act, and unless this is done, as we have shown, the conclusion reached by a majority of the court can not be maintained.

The predominating intent of the act of Feb., 1891, is to make the office elective. The title shows this. The terms of the act are that the office be "hereby declared elective," and these words are as potent as if the act had used the term "from and after the passage of this act." The field of operation for this clause is to make the office elective from the date of the act, and not in the future, because that field would be occupied by the latter clause in the absence of the first clause. This construction has no effect on the time fixed for the election of the Commissioner, which is only provided for in the latter clause of this act. It comes fully up to the rule declared in 59 Ala., and 71 Ala., *supra*, stated in a former part of this opinion, giving each clause a field of operation, and not placing one part in antagonism to another. The contention that such a construction is objectionable, because it gives the act a retroactive effect, is not tenable. Any person who accepts a public office, accepts it *cum onere.*

A public State office is not property, and no one has a vested right in it against the State. Every office of purely legislative origin continues by legislative permission. The incumbent holds as a mere tenant at will of the creative power. Before the expiration of his term, his compensation may be reduced, or cut off entirely. The office itself may be vacated or abolished. Courts may

[Lane v. Kolb.]

be averse to giving any act other than a prospec-
tive · operation, but when the legislative intent, is clear,
within constitutional limits, the legislative · intent compels
obedience, without regard to results.—*Ex parte Lambert*,
52 Ala. 79; *Beebe v. Robinson*, *Ib*. 66. "*Ita lex scripta est*"
marks the constitutional domain of the judicial department.

Possibly this opinion should not be extended further, but
we have considered the argument in connection with the
general statutes of the State in regard to filling vacancies
by a special election, and, if we are correct, in our conclu-
sion, the argument *ab inconvenienti* is excluded for another
reason.

There is no general provision in the statutes by which an
Agricultural Commissioner could have been elected at a
general election. It was, therefore, necessary to provide by
statute for such election. There was a general law which
provided for a special election, if "any vacancy occurs in any
State or county office filled by election of the people, not
otherwise provided for."—Sub-div. 4 of § 359 of the Code of
1886. This section does not provide that the vacancy is to
occur from any particular cause, or before or after there has
been an election. The language is "any vacancy not other-
wise provided for." That the office of Agricultural Com-
missioner is and has been a State office, from and after its
creation by the legislature of 1882-3 is not controverted;
and if we are correct in the conclusion that the statute
which declared the office to be elective went immediately
into operation, a vacancy in a State office necessarily oc ·
curred, and there being no law otherwise providing for the
filling of such vacancy, it is covered by the express language
of section 359, sub-div. 4, of the Code. It was not necessary,
therefore, for the legislature to provide by statute for filling
the vacancy, which occurred from making the office elective.
If the statute of February 18, 1891, had, in express terms,
made provisions for filling the vacancy caused by its enact-
ment, as provided by the general law for holding special
elections to fill vacancies, it would not be contended that
the vacancy could be filled in this way, and it would tend
strongly to show that the act was intended to go immedi-
ately into effect. Construing the act of February 18, 1891,
giving full force and effect to every clause in connection
with the general law which fully provides for filling vacan-
cies which occur in State offices not otherwise provided for,
and which rendered further legislation unnecessary in this
respect, we can not escape the conclusion, that the special
election law does apply, and that, under its provisions, the

[Lane v. Kolb.]

vacancy should be filled. The objection to our position that the vacancy in the office of Commissioner could only be filled by the people at a special election proceeds, as far as we have been able to discover, upon two grounds only. In the first place, it is said that no *special* election to the office can be held before 1892 because the act provides for the holding of the first *general* election at that time. This is, to our minds, patently a *non sequitur* in itself. But the fallacy of the contention is entirely demonstrated in the fact, that the time of the second and every succeeding general election is as definitely fixed by the act as that for the first general election. And if the prescription of this time as to the first precludes a special election to fill the vacancy now existing, the like prescription as to succeeding general elections will for the same reasons prevent the filling of any vacancy after the first general election in 1892. But we understand the majority to concede that after the first general election, a vacancy may be filled by special election, notwithstanding the next election provided for by the act is a general one to be held in 1894. It is most manifest to us that the admission destroys the argument. If a vacancy ever can be filled by a special election, it can be filled now.

The only other ground of objection to our position in this regard is that it will cost the State a large sum of money to hold a special election. This argument applies with equal force, if it has any force, to the filling of vacancies occurring subsequent to the first election.

If, as stated in the opinion of the Chief Justice, it will cost the State a large sum to hold a special election, (of which there is no evidence in the record) to fill a vacancy under the special election-law, is that to be used as an argument to control the meaning of a statute which expressly and clearly declares the office to be elective? Every authority cited precludes the argument when it is attempted to apply the rule to such a statute as this. It is far better that the principle of law which we contend for, be preserved as a safe-guard against encroachments on the will of the people, than to concede to the courts the power to raid the legislative department and defeat their will, under the pretext that there is a doubt as to the meaning of the statute, a doubt which finds existence purely in the assumption that its plain intention leads to unnecessary expenditure of a large sum of money. For these additional reasons we hold the argument *ab inconvenienti* falls to the ground, No more inconvenience or injury would result to the public welfare, than is liable to result at any time from a vacancy caused by the death or

[Lane v. Kolb.]

resignation of an incumbent, or a failure to elect a Commissioner at the general election, and which could be filled only by a special election.

Our conclusion, after laborious research and most careful examination of all the authorities, is that the office of Commissioner of Agriculture was vacated by the act of February 18, 1891, and the only authority to fill the vacany is by a special election.

We do not regard any action or indication that might be found in the journals of the two Houses of the General Assembly as proper to be considered in this connection; and we have neither investigated nor permitted them to exert any influence in forming our conclusions as to the intention of the legislature.

Whether since the vacancy occurred, the office has been filled by a *de facto* officer is not before us, and is not considered. See *Cary v. Stale*, 76 Ala. 78, and auhtorities cited. It follows, that, in our opinion, the judgment of the lower Court should be affirmed.